CORRIGAN, J.
In this no-fault coordination-of-benefits case, the trial court and the Court of Appeals ruled that an employer’s self-funded long-term disability plan may not be coordinated with no-fault wage loss benefits. We hold that a self-funded long-term disability plan constitutes “other health and accident coverage” that is subject to coordination under MCL 500.3109a. We therefore reverse the judgment of the Court of Appeals, and remand the matter to the trial court for entry of an order granting summary disposition for defendant.
1. UNDERLYING FACTS AND PROCEDURAL HISTORY
Plaintiff sustained injuries in an automobile accident. At the time of the accident, he was employed by the Michigan Department of Corrections. Under a collective bargaining agreement, the state provided a long-term disability (LTD) plan that covered plaintiff. An insurance company administered the plan and processed benefit payments, but the plan was self-funded *210 by deductions from employees’ paychecks and employer contributions.
Following the accident, plaintiff began receiving monthly payments of $2,220.04 under the LTD plan. Under the coordination-of-benefits clause in plaintiffs no-fault policy, defendant, plaintiffs no-fault insurer, deducted the LTD benefits from its no-fault wage loss payments, for a net amount of $1,467.76 a month for three years following the accident.[1] Plaintiff filed this action to challenge the coordination of benefits. The parties filed cross-motions for summary disposition. The trial court granted summary disposition for plaintiff.
The Court of Appeals affirmed in a two-to-one decision.[2] The majority noted that MCL 500.3109a permits coordination of no-fault benefits with “other health and accident coverage ....” The majority explained that in LeBlanc v State Farm Mut Automobile Ins Co, 410 Mich 173, 204; 301 NW2d 775 (1981), this Court had construed the word “coverage” as “a word of precise meaning in the insurance industry, [that] refers to protection afforded by an insurance policy, or the sum of the risks assumed by a policy of insurance.” While this definition has expanded under Court of Appeals case law to include medical benefits received from health plans typically provided by insurers, the majority opined that no such expansion of the term “coverage” has occurred regarding work-loss benefit plans.
Moreover, the majority construed Spencer v Hartford Accident & Indemnity Co, 179 Mich App 389; 445 NW2d *211 520 (1989), to preclude coordination where an employee receives “wage loss benefits from his employer through a formal wage continuation plan pursuant to a collective bargaining agreement.” The majority distinguished Rettig v Hastings Mut Ins Co, 196 Mich App 329; 492 NW2d 526 (1992), because in that case LTD benefits were provided under an insurance policy, rather than directly by the employer under a collective bargaining agreement.
Judge ZAHRA, the dissenting Court of Appeals judge in this case, opined that the self-funded LTD plan constituted “other health and accident coverage” that is subject to coordination under MCL 500.3109a. Unlike Spencer, where the employer paid wage continuation benefits directly to the employee, the instant case involves an insurance-type benefit paid by a third party from accumulated payroll contributions. The dissent would have followed Rettig, in which the Court of Appeals held that LTD benefits “constitute protection typically provided by health insurance plans, which include payments for medical expenses resulting from an accident as well as wage-loss replacement benefits.” Rettig, supra at 333 (emphasis added).
Judge ZAHRA also opined that the self-funded nature of the plan was not dispositive, because in drafting § 3109a, the Legislature used the broad term “coverage” rather than “insurance.” Moreover, case law reflects that the phrase “other health and accident coverage” includes coverage typically provided by an insurance company, regardless of whether it is actually provided by an insurance company in a particular case. For example, Michigan courts have held that “other health and accident coverage” includes: military medical benefits paid by the federal government, Tatum v Gov’t Employees Ins Co, 431 Mich 663; 431 NW2d 391 *212 (1988); Medicare benefits, LeBlanc, supra; medical benefits provided under a union plan, Lewis v Transamerica Ins Corp of America, 160 Mich App 413; 408 NW2d .458 (1987); services offered by health maintenance organizations, United States Fidelity & Guaranty Co v Group Health Plan of Southeast Michigan, 131 Mich App 268; 345 NW2d 683 (1983); and medical and disability benefits provided by the Army and Veterans Administration, Bagley v State Farm Mut Automobile Ins Co, 101 Mich App 733; 300 NW2d 322 (1980).
Defendant applied for leave to appeal in this Court. We held oral argument on whether to grant the application or take other peremptory action permitted by MCR 7.302(G)(1).[3]
II. STANDARD OF REVIEW
We review de novo the decision whether to grant summary disposition. Maiden v Rozwood, 461 Mich 109, 120; 597 NW2d 817 (1999). Moreover, the meaning of the phrase “other health and accident coverage” in MCL 500.3109a is a question of law that is also reviewed de novo. Jenkins v Patel, 471 Mich 158, 162; 684 NW2d 346 (2004).
III. DISCUSSION
A. LEGAL BACKGROUND
MCL 500.3109a states:
An insurer providing personal protection insurance benefits shall offer, at appropriately reduced premium rates, deductibles and exclusions reasonably related to other health and accident coverage on the insured. The deductibles and exclusions required to be offered by this section *213 shall be subject to prior approval by the commissioner and shall apply only to benefits payable to the person named in the policy, the spouse of the insured and any relative of either domiciled in the same household.
In Nyquist v Aetna Ins Co, 84 Mich App 589; 269 NW2d 687 (1978), the plaintiffs argued that Blue Cross-Blue Shield benefits were not insurance[4] and therefore could not be coordinated with no-fault benefits. The Court of Appeals concluded that coordination was permitted, noting “that § 3109a uses the word ‘coverage’ rather than ‘insurance’; the use of the broader term militates against plaintiffs’ restrictive reading of the section at issue.” Nyquist, supra at 592. Moreover, the plaintiffs’ restrictive reading would subvert the statutory purpose of eliminating duplicative coverage.
An employee’s use of accumulated sick leave, however, is not subject to coordination. In Orr v DAIIE, 90 Mich App 687; 282 NW2d 177 (1979), the Court of Appeals noted that the word “coverage” means protection by an insurance policy, and that the Legislature thus intended to limit coordination to health and accident insurance coverage. Sick leave does not fall within this definition. The plaintiffs sick bank could fluctuate depending on usage. Thus, “[a]ny rate reduction granted based upon this fluctuating benefit could not be actuarially sound. However, a rate based upon another policy of insurance with fixed limits of liability would enable the insurance company to offer appropriately reduced premium rates.” Id. at 690-691.
In LeBlanc, supra, this Court held that Medicare benefits were “health and accident coverage” subject to coordination. This Court stated that because the Legislature did not modify the statutory phrase “other *214 health and accident coverage” with the word “private,” the Legislature “intended to give unrestrained application of § 31Q9a to health and accident coverage from whatever source.” LeBlanc, supra at 202 (emphasis added). “Thus, both private and non-private plans were within the scope of the bill.” Id. at 203.
The LeBlanc Court also stated: “ ‘Coverage,’ a word of precise meaning in the insurance industry, refers to protection afforded by an insurance policy, or the sum of the risks assumed by a policy of insurance.” Id. at 204. This Court concluded that Medicare constituted “other health and accident coverage” because the Court perceived “no just reason to differentiate Medicare from other, more traditional, forms of health and accident coverage which irrefutably are within the scope of § 3109a. Just like any so-called private insurer, Medicare compensates providers of medical and hospital services on behalf of participants who require health care.” Id. at 205. This Court found it “inconsequential” that, in other contexts, “Medicare has been deemed not to be insurance in the usual sense of the term: the same has been said of Blue Cross and Blue Shield plans which, according to Nyquist, fall within § 3109a.”[5] Id.
*215 In United States Fidelity, supra, the Court of Appeals held that services offered by a health maintenance organization (HMO) were health and accident coverage for purposes of § 3109a. The Court of Appeals acknowledged that HMOs “have a unique character. Rather than providing health insurance and paying for the bills after the insured has been treated by a doctor, an HMO is a prepaid plan where the participant pays before hand for the services themselves. . . . Under traditional definitions, a health maintenance organization does not sell insurance.” United States Fidelity, supra at 272 (emphasis added).
But MCL 500.3109a; MSA 24.13109(1) does not refer to “insurance” but to “health and accident coverage”. Not only have medical and disability benefits from the Army and the Veterans Administration been included within this statute, Bagley v State Farm Mut Automobile Ins Co, 101 Mich App 733; 300 NW2d 322 (1980), but Medicare payments have also been included. [LeBlanc, supra.] The term used, “coverage”, is a broad term. [Nyquist, supra.] Accordingly, we hold that the services offered by defendant are “health and accident coverage” as defined by MCL 500.3109a; MSA 24.13109(1). [Id. at 272-273.]
In Lewis, supra, the Court of Appeals held that a union plan that pays medical expenses constitutes “other health and accident coverage” under § 3109a. The Court of Appeals noted that the intent of this provision “was to reduce insurance costs by obviating the potential for double recovery.” Lewis, supra at 418. “To accomplish this end, the Legislature purposely used the broad term ‘coverage’ rather than ‘insurance’ in describing health and accident benefits available to the insured independent of the no-fault contract.” Id.
In Tatum, supra, the Air Force paid the insured’s medical expenses pursuant to a federal statute. This Court held that those benefits constituted “other health *216 and accident coverage” under § 3109a. Reviewing the holdings in LeBlanc and Nyquist, the Tatum Court reasoned:
Military medical coverage is similar to both Blue Cross-Blue Shield and Medicare in the sense that, in various forms, each is comprehensive coverage of eligible individuals for their medical and hospitalization costs. Further, Blue Cross-Blue Shield coverage, when provided through one’s employer, can parallel that which is provided to active military personnel by the federal government under [the federal statute]. We can perceive no rational basis for concluding that military medical benefits, which essentially serve the same purpose as Blue Cross-Blue Shield and Medicare benefits, are not “health and accident coverage” within the meaning of § 3109a. [Tatum, supra at 670.]
In Spencer, supra, the Court of Appeals held that wage continuation benefits paid directly by an employer pursuant to a collective bargaining agreement did not constitute “health and accident coverage” under § 3109a. The Court of Appeals opined that the Uniform Motor Vehicle Accident Reparations Act (UMVARA), a model act on which our no-fault law is based, contained a broader coordination-of-benefits provision, and that the model provision would have included wage continuation benefits pursuant to a union agreement. But because our no-fault law was drafted more narrowly, the Court of Appeals believed that the Legislature did not intend to allow coordination in this situation.
In Rettig, supra, the Court of Appeals held that LTD benefits paid by an insurance company could be coordinated under § 3109a. The panel stated that the phrase “other health and accident coverage” “has generally been limited to benefits typically associated with health insurance plans.” Rettig, supra at 333. The LTD benefits at issue constituted such “coverage” “because they constitute protection typically provided by health insur *217 anee plans, which include payments for medical expenses resulting from an accident as well as wage-loss replacement benefits. LeBlanc, supra, p 204.” Rettig, supra at 333. The panel distinguished Spencer on the ground that the LTD benefits in Rettig were paid by an insurance company under an insurance policy, rather than a collective bargaining agreement.
B. ANALYSIS
While the case law is rather muddled regarding the precise meaning of the phrase “other health and accident coverage,” we agree with the Court of Appeals dissent in this case that the term does not require that a risk actually be insured under a commercial insurance policy. As noted in Nyquist, in drafting § 3109a, the Legislature used the broader term “coverage” rather than “insurance.” The LeBlanc Court stated that the term “coverage” refers to protection afforded by an insurance policy or the sum of risks assumed by an insurance policy. The Court concluded that Medicare is sufficiently similar to an insurance policy to constitute “health and accident coverage.” Similarly, military benefits and HMO benefits have been treated as sufficiently akin to insurance to constitute health and accident coverage. Tatum, supra; United States Fidelity, supra.
Therefore, as the Court of Appeals dissent observed, the central question under our case law is not whether an insurance company actually provided the coverage, but rather whether the coverage is typically provided by an insurance company. That approach is consistent with the statutory text, which refers merely to “coverage” and contains no language limiting its application to commercial insurance policies.
*218 Here, there is no question that LTD benefits are typically provided by insurance companies. Indeed, the Court of Appeals held in Rettig that LTD benefits fall within the statutory term. The fact that the coverage here was funded by employer and payroll contributions, rather than by a separate insurance company, does not alter the fact that this type of coverage is typically provided by insurance companies. We thus perceive no basis to preclude coordination with a self-funded plan.
Moreover, the view that a self-funded long-term disability plan is not “other health and accident coverage” disregards case law allowing coordination with self-funded medical plans under § 3109a. See, e.g., Lewis, supra; Michigan Millers Mut Ins Co v West Michigan Health Care Network, 174 Mich App 196; 435 NW2d 423 (1988); Auto-Owners Ins Co v Lacks Industries, 156 Mich App 837; 402 NW2d 102 (1987). We discern no principled reason why self-funded long-term disability plans should be treated differently from self-funded medical plans, in light of the holding in Rettig that LTD plans are “other health and accident coverage.”
Additionally, the courts in Rettig, Lewis, Michigan Millers Mut, and Lacks Industries manifested an understanding that causing not only third-party funded LTD and medical plans, but also self-funded ones, to qualify as “other health and accident coverage” is consistent with the Legislature’s overarching commitment in the no-fault act, and its later amendments, to facilitating reasonable economies in the payments of benefits, thus causing the costs of this mandatory auto insurance to be more affordable. See State Farm Fire & Cas Co v Old Republic Ins Co, 466 Mich 142, 151; 644 NW2d 715 (2002); Cruz v State Farm Mut Automobile Ins Co, 466 Mich 588, 597 n 13; 648 NW2d 591 (2002); *219 O’Donnell v State Farm Mut Automobile Ins Co, 404 Mich 524; 273 NW2d 829 (1979).
Also, the Court of Appeals has treated self-insurance as a form of insurance in other contexts. For example, in Allstate Ins Co v Elassal, 203 Mich App 548; 512 NW2d 856 (1994), the Court of Appeals recognized that self-insurance, as certified by the Secretary of State, is the functional equivalent of a commercial no-fault insurance policy. While the Court relied in part on provisions of the no-fault act, MCL 500.3101 et seq., and the financial responsibility act, MCL 257.501 et seq., it also discussed the “common understanding of insurance”:
The term insurance can be defined... as a contract between two parties for indemnification. Black’s Law Dictionary (4th ed), p 943. However, definitions of insurance also include: “coverage by contract whereby one party undertakes to indemnify or guarantee another against loss by a specified contingency or peril,” Webster’s Seventh New Collegiate Dictionary (1970), p 439 (definition 2b), see also Random House Webster’s College Dictionary (1991), p 699 (definition 2); “the sum for which something is insured,” Webster’s Seventh New Collegiate Dictionary, supra, p 439 (definition 2c); and “any means of guaranteeing against loss or harm,” Random House Webster’s, supra, p 699 (definition 6). In this case, Enterprise was certified as self-insured, meaning, for purposes of the no-fault and financial responsibility acts, that it had indemnified itself to satisfy judgments against it. [Elassal, supra at 555.]
We do not suggest that the holding in Elassal is directly relevant, because we are concerned here not with a self-insured no-fault plan, but rather with a self-funded LTD plan that a no-fault insurer seeks to coordinate with its no-fault policy. We simply observe that the reasoning in Elassal suggests that even if § 3109a referred to “insurance” and not (as it does) to “coverage,” a strong argument would still exist that a *220 self-funded LTD plan constitutes “insurance” under the common understanding of that term.
Further, we reject the Court of Appeals majority’s view — derived from the holding in Spencer — that the existence of a collective bargaining agreement somehow negates the existence of “other health and accident coverage.” The text of § 3109a refers to health and accident ■ coverage — the central question is whether other coverage exists, not how it came to exist. It is simply not relevant under the statutory text whether the coverage arose from a collective bargaining agreement.
Next, we address the Spencer Court’s reliance on language in the UMVARA, the model act on which our no-fault act was based. The Spencer Court observed that the UMVARA contained the following provision:
“(b) [B]asic reparation insurers may offer the following additional exclusions .. .
“(2) [Exclusions], in calculation of net loss, of any of those amounts and kinds of loss otherwise compensated by benefits or advantages a person receives or is unconditionally entitled to receive from any other specified source, if the other source has been approved specifically or as to type of source by the [commissioner] of insurance by rule or order adopted upon a determination by the [commissioner] (i) that the other source or type of source is reliable and that approval of it is consonant with the purposes of this Act, and (ii) if the other source is a contract of insurance, that it provides benefits for accidental injuries generally and in amounts as [sic] least as great for other injuries as for injuries resulting from motor vehicle accidents.” [Spencer, supra at 399, quoting 14 ULA Civil Procedural and Remedial Laws, UMVARA, § 14(b)(2), pp 82-83.]
*221 The Spencer Court also extracted an official comment to the model provision: “ ‘The cost reductions may be significant, however, in the case of an insurer offering to sell basic reparation policies to the employees of a large employer, who have defined, generous wage-continuation and accident and health benefits under a common employer-furnished or trade union plan.’ ” Spencer, supra at 399-400, quoting official comments to § 14(b)(2), supra, p 85.
The Spencer Court then reasoned that “it is clear from the comments that, under the UMVAKA, wage continuation benefits pursuant to a union agreement were intended to be coordinated with no-fault benefits otherwise payable.” Spencer, supra at 400. The Court then asserted that because the Legislature did not adopt “the broader language of the uniform act,” it “did not intend for no-fault benefits to be coordinated with a broad array of other benefits which may perhaps be equally duplicative.” Id.
We emphasize that a court’s fundamental interpretive obligation is to discern the legislative intent that may reasonably be inferred from the words expressed in the statute. Koontz v Ameritech Services, Inc, 466 Mich 304, 312; 645 NW2d 34 (2002). Where the Legislature has unambiguously conveyed its intent in a statute, judicial construction is not permitted. Because the proper role of the judiciary is to interpret, not write, the law, courts lack authority to venture beyond the unambiguous statutory text. Id.
The Spencer Court relied on the proposition that where the Legislature does not adopt a model provision, it presumably rejected the proposed language. Spencer, supra at 399, citing Michigan Mut Ins Co v Carson City Texaco, Inc, 421 Mich 144; 365 NW2d 89 (1984). The *222 Spencer Court failed, however, to adequately explain why this principle supported its holding.
The Legislature’s deviation from the language in a model act does not grant a court license to simply assert, without any reasoning, that (1) the statute is narrower than the model provision, and (2) the statute must therefore produce a different outcome than the model provision would generate. Such conclusions do not follow ineluctably from the Legislature’s rejection of particular language in a model provision.
It is, of course, possible that the Legislature rejected a model provision because it did not wish to enact the provision into law. Other inferences may arise, however. For example, our Legislature might simply have found a better way than the drafters of the model provision to express the same proposition. Perhaps our Legislature used a synonym or more succinct language to state whatever the drafters of the model provision had attempted to say. Or the Legislature might have concluded that another statutory provision in Michigan rendered the model provision unnecessary. Thus, the mere fact that a statute is written differently from a model act does not always compel the conclusion that our statute is written more narrowly.
But even if a statute is written more narrowly than a model provision, a court’s analysis does not end there. Even a statute that is written narrowly could apply to the particular case before the court. A statutory provision that provides for coordination, but in fewer circumstances than a model provision, will still allow coordination in some circumstances. Otherwise, the statutory provision would never allow coordination and would be essentially nugatory. Courts must give effect to every word, phrase, and clause in a statute, and must avoid an *223 interpretation that would render any part of the statute surplusage or nugatory. Koontz, supra at 312.
Thus, even if the Spencer Court had supported its assertion that § 3109a is written more narrowly than the model provision, the question would remain whether the statute allowed coordination in the circumstances at issue in that case. Merely asserting, as the Court did in Spencer, that a statute is narrow does not, by itself, resolve whether the statute applies to a given case.
A court may not simply announce that the text of a statute differs from the language in a model act (or, as in Spencer, a comment to the model act) as an excuse to avoid the court’s duty to interpret the statutory text adopted by the Legislature. The Spencer Court did not analyze the language of § 3109a. The Court failed to explain why the benefits at issue did not fall within the plain meaning of the term “other health and accident coverage.” The Court also did not explain how the statutory phrase is not only narrower than the model language, but too narrow to allow coordination in that case.
Here, it is simply unnecessary to decide whether the model provision is broader than the statute. We conclude that § 3109a allows coordination in this case, regardless of whether it is broader or narrower than the model provision. As discussed, we agree with the Court of Appeals dissent that the statutory phrase, “other health and accident coverage,” plainly includes defendant’s self-funded long-term disability plan. We discern no textual basis to limit the phrase “other health and accident coverage” to commercial insurance policies. Section 3109a contains no such limitation, and we believe the phrase “other health and accident coverage” includes self-funded plans.
*224 Therefore, regardless of how broadly the model provision might reach, the text of § 3109a plainly allows coordination of no-fault benefits with a self-funded long-term disability plan.[6] We overrule Spencer to the extent that it is inconsistent with this opinion.
IV CONCLUSION
We conclude that the phrase “other health and accident coverage” in § 3109a includes a self-funded long-term disability plan, and that defendant may therefore coordinate its no-fault wage loss payments with plaintiffs LTD benefits. We thus reverse the judgment of the Court of Appeals and remand the matter to the trial court for entry of an order granting summary disposition for defendant.
Taylor, C.J., and Weaver, Young, and Markman, JJ., concurred with CORRIGAN, J.

 Under MCL 500.3107(l)(b), no-fault wage loss benefits are payable for up to three years after the accident.

 Unpublished opinion per curiam, issued January 27, 2004 (Docket No. 245068).

 471 Mich 914 (2004).

 See Michigan Hosp Service v Sharpe, 339 Mich 357; 63 NW2d 638 (1954).

 Although the LeBlanc Court concluded that Medicare was “other health and accident coverage,” no coordination was allowed in that case because the insured did not elect a coordinated policy. This Court’s holding avoided the mandatory coordination provision in MCL 500.3109(1) (“Benefits provided or required to be provided under the laws of any state or the federal government shall be subtracted from the personal protection insurance benefits otherwise payable for the injury.”) by ruling that the permissive coordination provision in MCL 500.3109a controlled instead. This aspect of the analysis in LeBlanc is not implicated here because it is undisputed that plaintiff chose a coordinated policy. We also note that Congress has subsequently amended federal law to make Medicare benefits secondary to no-fault insurance. See 42 USC 1395y(b).

 Our dissenting colleague analyzes the model provision that the Legislature did not adopt. We again emphasize that a court’s fundamental interpretive obligation is to discern the legislative intent that may reasonably be inferred from the words expressed in the statute. Koontz, supra, p 312. Where the Legislature has unambiguously conveyed its intent in the statutory text, judicial construction is not permitted. Id. We have examined the statutory text and concluded that the phrase used by our Legislature, “other health and accident coverage,” is sufficiently broad to include a self-funded LTD plan. Because we are satisfied that the words adopted by our Legislature are sufficiently clear to resolve this question, we simply have no occasion to resort to the method of judicial construction utilized by the Spencer Court and advocated by the dissent in this case.