*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

VALERIE URECH,

        Plaintiff-Appellee,

and

JAGANNATHAN NEUROLOGICAL
INSTITUTE PLLC,

        Intervening plaintiff-Appellee

v

PIONEER STATE MUTUAL INSURANCE
COMPANY,

        Defendant-Appellant.

UNPUBLISHED
July 2, 2019

No. 339784
Wayne Circuit Court
LC No. 16-013750-NF

Before: SHAPIRO, P.J., and BECKERING and M. J. KELLY, JJ.

PER CURIAM.

In this no-fault personal protection insurance (PIP) case, defendant, Pioneer State Mutual Insurance Company, appeals as of right the trial court order denying its motion for summary disposition under MCR 2.116(C)(10). Because plaintiff, Valerie Urech, failed to establish the existence of a genuine issue of material fact on the issue of fraud, we reverse and remand for entry of an order granting Pioneer summary disposition.

-1-

## I. BASIC FACTS

On July 14, 2016, Urech was driving her husband to a doctor's appointment when she briefly lost consciousness and crashed her vehicle.[1] Urech sustained injuries in the accident that required hospitalization and surgery. She was released from the hospital on July 20, 2016. A nurse practitioner prescribed her with 24-hour per day attendant care and daily replacement services. Urech's son, Brian Urech, and Brian's fiancée, Kelly Haynie,[2] agreed to assist. At the time of the crash, Urech had a no-fault automobile insurance policy with Pioneer, and she sought first-party benefits pursuant to that policy.

Through her lawyer, Urech sent Pioneer letters in August 2016, September 2016, and November 2016; the letters demanded Pioneer remit payment to Urech and her lawyers for attendant care, replacement services, and medical mileage. Attached to the letters were forms stating that the attendant-care services were performed by Brian and Kelly and listing the number of hours per day Brian and Kelly provided those services. The attendant-care forms were signed by Brian, Kelly, and Urech.[3]

In October 2016, Urech filed suit against Pioneer, asserting that Pioneer had failed to pay the no-fault benefits due and owing under her insurance policy. In response, Pioneer asserted that Urech's entitlement to no-fault benefits under her policy was in dispute. Subsequently, Pioneer moved for summary disposition under MCR 2.116(C)(10), contending that Urech's no-fault policy was void under the rescission clause in the policy. The rescission provision states:

> The entire policy will be void if, in obtaining or maintaining this policy, or whether before or after a loss, you, an "insured", a "family member" or any other person seeking coverage has:
>
> 1. Intentionally concealed or misrepresented any material fact or circumstance;
>
> 2. Engaged in fraudulent conduct; or
>
> 3. Made false statements;

---

[1] In the lower court proceedings there was some evidence suggesting that Urech deliberately crashed the vehicle; however, that factual discrepancy is not relevant to the issues raised on appeal. Further, when reviewing a motion for summary disposition, we view the facts in the light most favorable to the non-moving party, which is in this case is Urech. See *Klein v HP Pelzer Auto Sys, Inc*, 306 Mich App 67, 75; 854 NW2d 521 (2014).

[2] Kelly married Brian in January 2017. Therefore, at the times relevant to the issue on appeal, she was not Urech's family member as that term is defined by Urech's no-fault policy.

[3] In addition, in November 2016 and December 2016, McGuffey Home Care submitted "health insurance claim forms" to Pioneer for the attendant-care services being provided by Kelly and Brian.

relating to this insurance.

Pioneer argued that the attendant-care forms contained material false statements. In particular, Kelly admitted in her deposition that she had claimed to have provided 12-hours of services to Urech, even on days when she was in a different city or a different state. Brian also admitted that Kelly did not provide attendant-care services for 12 hours each day, although he added that he was present and providing those services for 24 hours each day despite the fact that he only claimed 12 hours daily. Pioneer argued that Kelly, Brian, and Urech each committed fraud sufficient to trigger the rescission clause because they each signed the forms, thereby verifying—falsely—that Kelly had provided 12 hours of care to Urech even on days when she was not present.

In response, Urech conceded that Kelly made material, false statements. However, she asserted that at the time Kelly signed the forms she was not a "family member," which was defined by the policy to be "a person related to you by blood, marriage or adoption who is a resident of your household." Kelly was not related to Urech by blood, marriage, or adoption when she signed the forms. Urech also contended that Brian was not a family member because, when he signed the forms, he did not reside with Urech. Finally, Urech asserted that although she had signed the forms, she could not make "competent statements regarding if she had ever reviewed the forms that were submitted" because she was diagnosed with a traumatic brain injury and the symptoms of that injury included short-term memory loss. Additionally, Urech claimed that when she signed the forms she did not actually review the forms and was, in fact, unaware of whether she signed them before or after they were filled in. Urech supported her motion with medical records indicating that since the accident she had memory problems and had, in fact, been diagnosed with a traumatic brain injury.

Following oral argument, the trial court determined that there was a question of fact with regard to whether there was intent to defraud. Accordingly, the court denied Pioneer's motion for summary disposition. This appeal follows.

## II. SUMMARY DISPOSITION

## A. STANDARD OF REVIEW

Pioneer argues that the trial court erred by not granting summary disposition. The trial court's decision on a motion for summary disposition is reviewed de novo. *MEEMIC Ins Co v Fortson*, 324 Mich App 467, 473; 922 NW2d 154 (2018), lv gtd 926 NW2d 805 (2019). A motion under MCR 2.116(C)(10) tests the factual support for a claim. *Urbain v Beierling*, 301 Mich App 114, 122; 835 NW2d 455 (2013).

> In evaluating a motion for summary disposition brought under Subrule (C)(10), a reviewing court considers affidavits, pleadings, depositions, admissions, and other evidence submitted by the parties in the light most favorable to the party opposing the motion. Summary disposition is properly granted if the proffered evidence fails to establish a genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law. [*Klein v HP Pelzer Auto Sys, Inc*, 306 Mich App 67, 75; 854 NW2d 521 (2014).]

B. ANALYSIS

1. BRIAN AND KELLY

Pioneer first argues that Brian and Kelly made fraudulent statements that triggered the rescission clause in Urech's no-fault policy. Again, that provision provides:

> The entire policy will be void if, in obtaining or maintain this policy, or whether before or after a loss, you, an "insured", a "family member" or any other person seeking coverage has:

> 1. Intentionally concealed or misrepresented any material fact or circumstance;

> 2. Engaged in fraudulent conduct; or

> 3. Made false statements;

> relating to this insurance.

Urech argues that the rescission clause does not apply to any statements made by Brian and Kelly because they are not "family members" and they are not "seeking coverage" under the policy. Pioneer responds that Brian and Kelly qualify as "any other person seeking coverage" because they sought payment for benefits owed to Urech under the no-fault act.

When interpreting an insurance policy, we "must look to the language of the insurance policy and interpret the terms therein in accordance with Michigan's well-established principles of contract construction," the predominant rule being that "an insurance contract must be enforced in accordance with its terms." *Henderson v State Farm Fire & Cas Co*, 460 Mich 348, 353-354; 596 NW2d 190 (1999). The goal in doing so "is to honor the intent of the parties." *Tenneco Inc v Amerisure Mut Ins Co*, 281 Mich App 429, 444; 761 NW2d 846 (2008). "When a contract is unambiguous, it must be enforced according to its terms, and this Court must resist 'the temptation to rewrite the plain and unambiguous meaning of the policy under the guise of interpretation.' " *Fortson*, 324 Mich App at 481, quoting *Upjohn Co v New Hampshire Ins Co*, 438 Mich 197, 207; 476 NW2d 392 (1991).

Here, the phrase "seeking coverage" is not defined by the policy. Undefined terms are accorded their common meaning, which can be derived by reference to a dictionary. *Fortson*, 324 Mich App at 481. The term "coverage" is defined as "[i]nclusion of a risk under an insurance policy; the risks within the scope of an insurance policy." *Black's Law Dictionary* (8th deluxe ed). It is also defined by *Merriam-Webster's Collegiate Dictionary* (11th ed) as "[s]omething that covers: as **a** : inclusion within the scope of an insurance policy . . ." and as "all the risks covered by the terms of an insurance contract . . ." Furthermore, in 1979, this Court explained that the term "coverage" when used in connection with insurance means "protected by the insurance policy." *Orr v Detroit Auto Inter-Ins Exchange*, 90 Mich App 687, 690; 282 NW2d 177 (1979). In *Jarrad v Integon Nat Ins Co*, 472 Mich 207, 213; 696 NW2d 621 (2005) our Supreme Court relied on *Orr* for the proposition that "the word 'coverage' means protection by an insurance policy . . ." Therefore, as it relates to insurance, the term "coverage" means the

-4-

protection provided by an insurance policy. "Coverage" does not, therefore, include payments for benefits made to individuals who provided services to a claimant who has coverage under the terms of the policy.

Unsurprisingly, this interpretation is consistent with how Urech's policy refers to the term "coverage." Broadly, the policy provides the following coverage: (1) liability coverage, (2) no-fault coverage, (3) uninsured motorist coverage, and (4) underinsured motorist coverage. Brian and Kelly are not "seeking" liability coverage, no-fault coverage, uninsured motorist coverage, or underinsured motorist coverage. They are seeking payment for services that they claim they provided to Urech. Moreover, Section VI of the no-fault policy addresses "duties after an accident or loss," and it expressly provides:

We have no duty to *provide coverage under this policy* unless there has been full compliance with the following duties:

A. We must be notified promptly of how, when and where the accident or loss happened. Notice should also include the names and addresses of any injured persons and of any witnesses.

B. You, a family member, or any other person *seeking coverage* must:

1. Cooperate with us in the investigation, settlement or defense of any claim or suit.

2. Promptly send us copies of any notices or legal papers received in connection with the accident or loss.

3. As often as we reasonably require:

   a. submit to physical exams by physicians we select. We will pay for these exams.

   b. Submit to examinations under oath, while not in the presence of any other "insured" or "family member" and subscribe the same.

   c. Produce representative, employees, members of your household or others for examinations under oath to the extent it is within your power to do so.

4. Authorize us to obtain:

   a. Medical reports; and

   b. Other pertinent record.

5. Submit a proof of loss when required by us. [Emphasis added.]

As is clear from the above policy provisions, a person "seeking coverage" is a person seeking to make a claim under the policy. In doing so, the person seeking coverage must fulfill enumerated duties that would not be expected or required from a person providing services to an insured person and then seeking payment for the services rendered. Consequently, based on the policy language, Brian and Kelly—individuals seeking payment for benefits provided to Urech—cannot trigger the rescission clause. Accordingly, to the extent that they made false or misleading statements in connection with the attendant-care forms, their fraud is not a basis for voiding the contract under the rescission clause. See *Fortson*, 324 Mich App at 484 (stating that fraud committed by an individual not listed in a rescission clause is insufficient to trigger the fr rescission clause).[4]

## 2. URECH

Whether Urech committed fraud sufficient to trigger the rescission clause is a more nuanced matter. There is no doubt that she is a person whose material, fraudulent statements will trigger the language voiding the entirety of the policy. In *Bahri v IDS Prop Cas Ins Co*, 308 Mich App 420, 424-425; 864 NW2d 609 (2014), this Court explained that before an insurer may void a policy based on the insured's *misrepresentation of a material fact*, the insurer must show:

> (1) the misrepresentation was material, (2) that it was false, (3) that the insured knew that it was false at the time it was made or that it was made recklessly, without any knowledge of its truth, and (4) that the insured made the material misrepresentation with the intention that the insurer would act upon it. [Quotation marks and citation omitted.]

"A statement is material if it is reasonably relevant to the insurer's investigation of a claim." *Id.* at 425 (quotation marks and citation omitted).[5]

In this case, the parties do not dispute that the forms contained material and false statements.[6] However, Urech argues that there is a material, factual dispute with regard to whether *she* intended to defraud Pioneer when she signed the forms. She argues that she

---

[4] This is not to say that Pioneer must pay the fraudulent claims made by Brian and Kelly. See *Shelton*, 318 Mich App 648, 655; 899 NW2d 744 (2017) ("As always, if an insurer concludes that a claim is fraudulent, it may deny the claim.").

[5] In this regard, although Pioneer's policy states that it may void the entire policy if the insured engages in "fraudulent conduct" or makes "false statements," under *Bahri*, it may only do so if the fraudulent conduct or false statements are *material*, were made with the requisite intent, and were made with the intention that the insurer act on them. See *Bahri*, 308 Mich App at 424-425.

[6] Again, in order to void or rescind an insurance policy on the basis of fraud, there must be a *material* misrepresentation. *Bahri*, 308 Mich App at 424-425. Whether the misrepresentations in the attendant-care forms constitute *material* misrepresentations was not raised below. Accordingly, for purposes of this opinion, we will assume that the misrepresentations were, in fact, material under the facts of this case.

sustained a traumatic brain injury in the accident. She asserts that, as a result, a legal guardian was appointed by the court. She also stated that her brain injury causes short-term memory loss, which "would severely hinder her ability to be able to actually check the forms for accuracy and completeness." Finally, she directs this Court to her deposition testimony, where she stated that she would simply sign the attendant-care forms, that she does not remember signing them, and that she did not review them or even know if they were filled out when she signed them.

We agree that a person with a traumatic brain injury that causes short-term memory loss may lack the intent necessary to establish fraud. However, when responding to a motion for summary disposition, Urech "could not rely on 'mere allegations or denials' in [her] pleadings, but had to, 'by affidavits or as otherwise provided in [MCR 2.116], set forth specific facts showing that there is a genuine issue for trial.' " *Barnard Mfg Co, Inc v Gates Performance Engineering, Inc*, 285 Mich App 362, 374; 775 NW2d 618 (2009), quoting MCR 2.116(G)(4).

In this case, Urech did not attach a copy of her deposition to her response for summary disposition. Although she has attached a copy of it to her brief on appeal, a party may not expand the record on appeal. *People v Nix*, 301 Mich App 195, 203; 836 NW2d 224 (2013). Accordingly, we will not consider her deposition testimony when conducting our de-novo review of the trial court's summary-disposition decision.[7]

Next, although Urech asserted in the proceedings below that she was appointed a guardian because of her "significant cognitive injuries," she provided no evidence in support of that assertion. A trial court may appoint a guardian if it "finds by clear and convincing evidence both that the individual for whom a guardian is sought is an incapacitated individual and that the appointment is necessary as a means of providing continuing care and supervision of the

---

[7] In her response to the motion for summary disposition, Urech argued that in her deposition, she stated that she signed the forms where told and did not know whether the information was filled in when she signed the forms. However, she did not actually attach a copy of the deposition to the response, so those statements amount to mere allegations or promises that she will be able to illuminate a fact question in the future. Those statements, therefore, are insufficient to avoid summary disposition.

Moreover, Urech's testimony was that because of her brain injury she has "trouble with dates and spans." Yet with regard to the attendant-care forms, she stated that she "just signed my name to them," "didn't look at them," and did not ask any questions about them. She added that she never even asked why Brian and Kelly were filling the forms out. The intent requirement for fraud can be established two ways: (1) by showing that the person making the statement knew that it was false when he or she made the statement, or (2) by showing that the person made the statement "reckless, without any knowledge of its truth and as a positive assertion." *Titan Ins Co v Hyten*, 491 Mich 547, 555; 817 NW2d 562 (2012) (quotation marks and citation omitted). Thus, even viewing the evidence in the light most favorable to Urech, including her deposition testimony, her testimony only establishes that she had a brain injury that caused her to have difficulty with remembering dates, but, even so, she just blindly signed the forms without regard to the truth or falsity of the statements contained therein.

incapacitated individual . . . ." MCL 700.5306(1). An incapacitated individual "means an individual who is impaired by reason of mental illness, mental deficiency, physical illness or disability, chronic use of drugs, chronic intoxication, or other cause, not including minority, to the extent of lacking sufficient understanding or capacity to make or communicate informed decisions." MCL 700.1105(a). Here, the only evidence presented as to why a guardian was appointed is Kelly's testimony that she was appointed because of the traumatic brain injury, and information included in a neuropsychological evaluation performed by Charles Seigerman, a licensed psychologist. Seigerman only notes that Urech's physician, Dr. Bleiberg, recommended that Urech be "assigned a legal guardian for medical decision-making and [to] facilitate a transfer to an inpatient traumatic brain injury facility." Accordingly, even viewing the evidence in the light most favorable to Urech, there is nothing in the record to support that a guardian was appointed to her because of her "significant cognitive injuries" existing at the time that she signed the attendant-care forms. Rather, the evidence only provides that sometime after the accident, a guardian was appointed, at least in part because of Urech's brain injury.

Urech also claims that her traumatic brain injury caused short-term memory loss. There is evidence in the record supporting that Urech had memory problems and a traumatic brain injury caused by the crash. In December 2016, Urech's psychiatrist, Dr. Marvin Bleiberg, diagnosed her with a traumatic brain injury, which he attributed to the crash. Brian testified that he observed Urech had memory difficulties after the accident, noting that he had to write down when she took her medication because she was unable to recall if she did or did not. Further, there is evidence that in January 2017, Urech became intoxicated, shot her bathroom floor, and made suicidal comments that resulted in her being admitted to the psychiatric ward of War Memorial Hospital in January 2017. The progress notes from the hospital indicated that Urech was feeling foggy and confused, and she stated that "there is something wrong with my thinking." Urech also self-reported having difficulty remembering the rules to a new game she learned at the facility. In addition, the neuropsychological evaluation contains evidence that Urech had difficulties with her memory. For instance, the test showed that Urech's working memory index was in the fourth percentile, placing her in the mildly to moderately impaired range. He also noted in his report that, overall, Urech "demonstrates good overall attention and concentration but seems to have fluctuating working memory."

Yet, there is no evidence that the traumatic brain injury and its associated memory problems affected Urech's ability to understand that the attendant-care forms were inaccurate when she signed them. If there were some evidence suggesting that because of her memory problems she could not form the intent necessary to commit fraud, then there would certainly be a fact question. If there were evidence that when she signed the forms she believed that they were accurate based on her memory of the services provided, then there would be a fact question. However, simply providing evidence that she was sometimes forgetful because of a brain injury is insufficient to create a genuine issue of material fact. Stated differently, Urech has not presented any evidence showing that her memory loss affected her ability to understand the forms that she signed contained false statements. In the absence of such evidence, we can only

speculate that because she had memory issues and a brain injury she may not have appreciated or realized that the forms she was signing contained materially false statements.[8]

In conclusion, in the proceedings before the trial court, Pioneer came forward with evidence in support of its claim that Urech committed fraud. It presented the attendant-care forms containing Urech's signature, and testimony from Brian and Kelly establishing that the information contained in the forms included numerous false statements. See MCR 2.116(G)(3) (requiring a party moving for summary disposition to support its motion with affidavits, depositions, admissions, or other documentary evidence). Because Pioneer properly supported its motion, the burden shifted to Urech "to establish that a genuine issue of disputed fact exist[ed]." *Quinto v Cross & Peters Co*, 451 Mich 358, 362; 547 NW2d 314 (1996). She failed to do so. Consequently, because Urech did not support her motion for summary disposition, the trial court was required to grant Pioneer's motion. See *Barnard*, 285 Mich App at 370.

Reversed and remanded. No taxable costs are awarded under MCR 7.219(A). We do not retain jurisdiction.

/s/ Jane M. Beckering
/s/ Michael J. Kelly

---

[8] We do not find persuasive Pioneer's argument that because Urech was not diagnosed with a traumatic brain injury until after she submitted the challenged forms she cannot use that injury to negate the intent element of a fraud claim. Regardless of whether it was diagnosed or not when she submitted the forms, given that there is evidence that she sustained the injury in the crash, there is evidence that she was under the effect of it when she signed the forms. Thus, if there was medical testimony that the traumatic brain injury impaired Urech's ability to understand or appreciate the truth or falsity of the forms, there would be evidence to negate the intent element regardless of whether the injury was diagnosed.