**Michigan Supreme Court**
**Lansing, Michigan**

# Opinion

Chief Justice:          Justices:
Clifford W. Taylor     Michael F. Cavanagh
                       Elizabeth A. Weaver
                       Marilyn Kelly
                       Maura D. Corrigan
                       Robert P. Young, Jr.
                       Stephen J. Markman

**FILED JULY 29, 2005**

EVA DEVILLERS, as Guardian and
Conservator of Michael J. Devillers,

    Plaintiff-Appellee,

v                                                            No. 126899

AUTO CLUB INSURANCE ASSOCIATION,

    Defendant-Appellant.

_____

BEFORE THE ENTIRE BENCH

YOUNG, J.

In its bypass application for leave to appeal, defendant insurer asks that we overrule *Lewis v DAIIE*[1] and apply as written the "one-year-back" limitation provided for in MCL 500.3145(1) for recovering no-fault personal protection insurance benefits. In *Lewis*, this Court adopted a judicial tolling doctrine under which the one-year statutory period is tolled from the time a specific claim for benefits is filed to the date the insurer formally denies liability. The trial court in this case

_____

[1] 426 Mich 93; 393 NW2d 167 (1986).

1

relied on *Lewis* in rejecting defendant's assertion that plaintiff's claim was limited by the statutory one-year-back rule.

No member of this Court disputes that § 3145(1) clearly and unambiguously states that a claimant "may not recover benefits for any portion of the loss incurred more than 1 year before the date on which the action was commenced." Because the *Lewis* rule contravenes this plain statutory directive and ignores almost a century of contrary precedent, it is hereby overruled. Defendant is entitled to summary disposition to the extent that plaintiff seeks benefits for losses incurred more than one year prior to the date on which this action was commenced.

## I.  FACTS AND PROCEDURAL HISTORY

Michael Devillers was an insured under a policy of no-fault automobile insurance issued to his parents by defendant Auto Club Insurance Association. In September 2000, Michael, then age sixteen, was seriously injured in an automobile accident. His injuries included a traumatic brain injury. Michael's mother, plaintiff in this case, cared for him after he was discharged from the hospital.

Defendant paid plaintiff benefits for home health care for the period of October 20, 2000, to February 14, 2001. On February 14, 2001, defendant received a physician's

2

prescription stating that Michael could function without close supervision. Defendant discontinued home health care payments effective February 15, 2001, based on the prescription indicating that Michael did not require supervision.[2] Plaintiff continued, without payment, to provide services for Michael, including driving him to and from school and the doctor's office. On October 7, 2002, defendant wrote a letter to plaintiff memorializing the February 2001 discontinuation of benefits.

Plaintiff filed a complaint on November 12, 2002, seeking payment for services allegedly rendered for which she did not receive payment. At issue in this case is the nine-month period beginning on February 16, 2001 (the day after defendant discontinued paying home health care benefits), and ending on November 12, 2001 (one year prior to the filing of the complaint). Defendant moved for partial summary disposition with respect to the benefits sought for that nine-month period, arguing that plaintiff was precluded from recovering benefits under the one-year-back rule of MCL 500.3145(1).

---

[2] However, based upon a later prescription, defendant began paying plaintiff for home health care and attendant care as of October 15, 2003, and it continues to make these payments.

3

Plaintiff contested defendant's motion, arguing that, pursuant to *Lewis,* the one-year limitations period provided for in § 3145(1) was tolled from February 15, 2001 (the date that defendant discontinued home health care benefits and attendant care benefits) to October 7, 2002 (the date of defendant's letter memorializing the termination).

The trial court denied defendant's motion for partial summary disposition, citing *Lewis.* Defendant then filed an emergency application for leave to appeal in the Court of Appeals, arguing that the judicial tolling doctrine adopted in *Lewis* should be abrogated. Defendant additionally filed a bypass application for leave to appeal in this Court, noting that only this Court has the power to overrule *Lewis*.

The Court of Appeals denied leave to appeal. This Court entered an order staying trial, and we subsequently entered an order granting defendant's application for leave to appeal. Because we believe that the *Lewis* Court exceeded its constitutional authority by engrafting onto the statutory one-year period a judicial tolling mechanism, we overrule *Lewis.* Moreover, because this case does not fall into that limited category of decisions in which prospective application is justified, we give our decision retroactive effect for this and pending cases in which a

4

*Lewis* challenge has been preserved. Accordingly, we remand to the trial court with directions to enter partial summary disposition in favor of defendant with respect to the benefits sought for the period from February 16 to November 12, 2001.

## II. STANDARD OF REVIEW

Issues of statutory construction and other questions of law are subject to review de novo by this Court.[3] Similarly, we review de novo a trial court's decision whether to grant summary disposition.[4]

## III. ANALYSIS

### A. BACKGROUND: JUDICIAL TOLLING AS APPLIED TO PRIVATE INSURANCE CONTRACTS AND STATUTORY FORM INSURANCE POLICIES

The germination of the idea that a judicial tolling doctrine should be applied to § 3145(1) can be traced to this Court's 1976 decision in *Tom Thomas Organization, Inc v Reliance Ins Co*.[5] Rather than a statutory provision, *Tom Thomas* concerned a contractual provision in an inland marine policy of insurance limiting the time for bringing

---

[3] *Preserve the Dunes, Inc v Dep't of Environmental Quality*, 471 Mich 508, 513; 684 NW2d 847 (2004); *Mack v Detroit*, 467 Mich 186, 193; 649 NW2d 47 (2002).

[4] *Jarrad v Integon Nat'l Ins Co*, 472 Mich 207, 212; 696 NW2d 621 (2005); *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999).

[5] 396 Mich 588; 242 NW2d 396 (1976).

5

suit under the policy to twelve months "after discovery by the insured of the occurrence which gives rise to the claim." Noting that this Court had long enforced such policy limitations as written,[6] the *Tom Thomas* Court nevertheless rejected this prevailing rule in favor of the judicial tolling approach taken by the New Jersey Supreme Court in *Peloso v Hartford Fire Ins Co,*[7] which held that the twelve-month limitation of actions provision in a *statutory*

---

[6] See *Tom Thomas, supra* at 592 n 4. Policy limitations of less than six years have been enforced by this Court without discussion of reasonableness. See, *e.g., Lombardi v Metropolitan Life Insurance Co*, 271 Mich 265; 260 NW 160 (1935) (group disability plan; two-year limitation); *Bashans v Metro Mutual Insurance Co*, 369 Mich 141; 119 NW2d 622 (1963) (accidental injury and illness; two-year limitation); *Dahrooge v Rochester German Insurance Co*, 177 Mich 442; 143 NW 608 (1913) (standard fire insurance policy; one-year limitation); *Betteys v Aetna Life Insurance Co*, 222 Mich 626; 193 NW 197 (1923) (disability or death indemnity policy; one-year limitation); *Harris v Phoenix Accident & Sick Benefit Ass'n*, 149 Mich 285; 112 NW 935 (1907) (accident and sick benefit policy; six-month limitation).

While it acknowledged this contrary line of precedent, *Tom Thomas* did not overrule any of those cases. This appears to have been a common practice of this Court during this era. See, e.g., *Raska v Farm Bureau Mut Ins Co of Michigan*, 412 Mich 355; 314 NW2d 440 (1982); *People v Jones*, 395 Mich 379; 236 NW2d 461 (1975), and *People v Chamblis*, 395 Mich 408; 236 NW2d 473 (1975), both overruled in part in *People v Cornell*, 466 Mich 335 (2002); *Simon v Security Ins Co*, 390 Mich 72; 210 NW2d 322 (1973).

[7] 56 NJ 514; 267 A2d 498 (1970).

form insurance policy[8] was tolled from the time an insured gave notice of loss until the insurer formally denied liability. The *Peloso* court, opining that statutory proof of loss and payment of claim provisions operated to shorten the time for bringing suit, stated that tolling the limitations period would ensure that the insured was "not penalized for the time consumed by the company while it pursues its contractual and statutory rights to have a proof of loss, call the insured in for examination, and consider what amount to pay . . . ."[9]

In adopting wholesale the approach of the *Peloso* court, this Court in *Tom Thomas* stated that doing so was necessary in order to reconcile the twelve-month policy limitation with other policy provisions that incorporated "[s]ubstantial delays"[10] into the claim process:

> The insured is generally allowed 60 to 90 days to file proof of loss. The insurer is generally given another 60 days to pay or settle the claim.
>
> Notwithstanding diligence by both parties at all stages of the claim procedure, considerable time often elapses before the insured learns

---

[8] A "statutory form" insurance policy refers to an insurance policy that includes mandatory terms and provisions compelled by statute. See, e.g., former MCL 500.2832, discussed later in this opinion, concerning fire insurance policies issued in Michigan.

[9] *Peloso, supra* at 521.

[10] *Tom Thomas, supra* at 592.

whether the insurer will pay. Even if the insured promptly reports a loss to his insurance agent, discussions concerning resolution of the claim may take weeks. Additional time often passes before the insurance company provides a form for filing proof of loss. Even then the insured does not know whether it will be necessary to start an action; under the policy in this case, payment is not required until 60 days after "acceptance" by the insurer of the proof of loss. No time limit for acceptance is imposed.[11]

Thus, the *Tom Thomas* Court held that the insured's action, which was filed more than twelve months after the date of the loss, but less than twelve months after the insurer denied liability, was not barred by the twelve-month policy limitation.[12]

In *In re Certified Question (Ford Motor Co v Lumbermens Mut Cas Co)*,[13] this Court extended the *Peloso/Tom Thomas* tolling doctrine to Michigan's statutory standard form fire insurance policy, former MCL 500.2832, which then provided that

[n]o suit or action on this policy for the recovery of any claim shall be sustainable in any court of law or equity unless all the requirements of this policy shall have been complied with, and unless

---

[11] *Id.* at 592-593.

[12] Justice Lindemer, joined by Justice Coleman, dissented, noting that "[t]o adopt [the *Peloso* approach] is, in effect, to rewrite the contract in favor of the party which, for a six-month period, was guilty of sleeping on its bargained-for rights." *Tom Thomas, supra* at 601.

[13] 413 Mich 22; 319 NW2d 320 (1982).

commenced within twelve months next after inception of the loss.

Noting that § 2832 contained proof-of-loss and claim payment provisions identical to those contained in the New Jersey statutory policy form at issue in *Peloso*,[14] this Court held that

> [l]ogic requires that we apply the same analysis when faced with Michigan's *statutory* policy provisions which are identical to the provisions reconciled in *Peloso*. By permitting the limitation period to be tolled, we reconcile the apparently identical incongruity between the statutory proof-of-loss and payment provisions, and the limitation clause.[15]

The *Ford* Court rejected the defendants' argument that our 1913 decision in *Dahrooge v Rochester German Ins Co*[16] was controlling and had expressly repudiated judicial revision of the terms of the statute. In *Dahrooge*, this Court had refused to engraft onto the terms of the statutory standard fire insurance policy then in effect[17] a judicial tolling provision that would have tolled the

---

[14] See *Ford, supra* at 31, 32 n 4. The statutory policy provided a sixty-day period for the insured to supply proof of loss and a sixty-day period following proof of loss and ascertainment of the loss for the insurer to pay the claim. MCL 500.2832.

[15] *Id*. at 31-32 (emphasis in original).

[16] 177 Mich 442; 143 NW 608 (1913).

[17] 1905 PA 277. This predecessor of former MCL 500.2832 contained essentially the same terms as the version of § 2832 at issue in *Ford*.

9

commencement of the twelve-month limitations period until sixty days after the filing of the proof of loss:

> Standard policies similar to that before us have been adopted, and their use made compulsory by statute in many States. It has been repeatedly held, in passing on their various provisions, that they should be construed according to the plain meaning of the language used, and that the trend of authority is towards enforcing the legislative command when clearly expressed, rather than to nullify and modify by strained constructions. The provision that an action cannot be sustained "unless commenced within twelve months next after the fire" is very plain, clear, and simple language. If it was the legislative intent that this should have other than the natural meaning, it would have been a simple matter to have so provided.[18]

Rather than explicitly overruling *Dahrooge*, the *Ford* Court "distinguished" that case on the basis that its

> narrow reasoning . . . did not attempt to reconcile the obvious incongruity between the proof-of-loss and payment provisions, and the limitation provision of the statute. Accordingly, *Dahrooge* did not address the *Tom Thomas-Peloso* tolling analysis.

* * *

> Since our focus today must fairly encompass all interwoven statutory provisions, we cannot subscribe to a narrow analysis which unduly emphasizes a single statutory provision. While the limitation provision commands that the insured has a clear 12 months to institute suit, the proof of loss and payment clauses shrink this period.

* * *

---

[18] *Dahrooge, supra* at 451.

10

. . . The statutory standard policy provisions are reconciled, as was stated in *Peloso*, 521, to reach a "fair resolution of the statutory incongruity". The period of limitation begins to run from the date of the loss, but the running of the period is tolled from the time the insured gives notice until the insurer formally denies liability.[19]

Justice Ryan, joined by Chief Justice Coleman, opined in dissent that there existed no justification "for writing into the Michigan statutory form of fire insurance policy the tolling provision which the Court has announced today."[20] Justice Ryan noted that in once again subscribing to the approach of "the villain in the piece," *Peloso,* the majority "completely disregards, indeed rejects, the plainly expressed intent of the Legislature in favor of the appearance of judicial consistency."[21] Justice Ryan further noted that *Dahrooge* had addressed and rejected the claim

---

[19] *Ford, supra* at 33-38. Because *Dahrooge* pointedly refused to adopt judicial tolling in contravention of the statutory limitation, it is hard to understand why *Ford* and *Dahrooge* are not irreconcilably in conflict. However, as noted previously, see n 6 of this opinion, during this era, this Court frequently paid little attention to the inconsistencies among its cases and declined to reduce confusion in its jurisprudence by overruling conflicting decisions. *Dahrooge* has never been overruled. *Dahrooge,* and cases like *Dahrooge* extending back to the turn of the 20th century, still appear to be good law, despite *Lewis*.

[20] *Id*. at 39.

[21] *Id*. at 45.

made by the plaintiff, and that it ought to have been followed as binding authority:

> It is noteworthy that the Court today does not overrule *Dahrooge*, it merely denigrates it as employing "narrow reasoning" for its failure to "reconcile the obvious incongruity between the proof of loss and payment provisions, and the limitation provision of the statute." The *Dahrooge* Court's "failure" to undertake such reconciliation was evidently its inability, like mine, to perceive that the proof of loss and payment provisions, and the limitation provision of the statute, are "incongruous", "conflicting" or "inconsistent".

> The proof of loss and settlement provisions of the statutory policy provide that a proof of loss must be filed by the insured within 60 days of the loss and suit may not be brought until 60 days after the proof of loss is filed. The limitation provision declares that suit upon a loss must be brought within 12 months of the loss.

> I am unable to see how those provisions are incongruous, inconsistent or conflicting. The first of them announces that the insurer is liable 60 days after the proof of loss is filed by the insured—a period obviously intended to afford opportunity for notification of the loss by the insured and assessment of it by the insurer. The limitation provision provides that the insured has 12 months from the date of the loss to start suit.

> Where is the inconsistency?

> * * *

> The majority opinion suggests to me rather forcefully that the Court's concern is not that the Legislature has really contradicted itself in establishing a proof of loss plus 60 days no-suit period for perfecting the claim and a 12-month limitation of action provision, but that, in the Court's view, a fairer, more desirable and more reasonable approach would be a tolling of the running of the period of limitation while the

12

parties are negotiating a settlement of the claim. Needless to say, had the Legislature wanted to do it that way, it could easily have done so . . . . [22]

Like Justice Ryan, we believe that the *Tom Thomas* and *Ford* majorities found inconsistencies where none existed and, under this thin veil, inserted their own policy views into the otherwise contrary statutory language at issue.

## B. EXTENSION OF THE JUDICIAL TOLLING DOCTRINE TO THE NO-FAULT "ONE-YEAR-BACK" PROVISION OF § 3145(1)

MCL 500.3145(1) provides, in relevant part, as follows:

> An action for recovery of personal protection insurance benefits payable under this chapter for accidental bodily injury may not be commenced later than 1 year after the date of the accident causing the injury unless written notice of injury as provided herein has been given to the insurer within 1 year after the accident or unless the insurer has previously made a payment of personal protection insurance benefits for the injury. If the notice has been given or a payment has been made, the action may be commenced at any time within 1 year after the most recent allowable expense, work loss or survivors loss has been incurred. *However, the claimant may not recover benefits for any portion of the loss incurred more than 1 year before the date on which the action was commenced.* [Emphasis supplied.]

As we noted in *Welton v Carriers Ins Co*,[23] § 3145(1) contains two limitations on the time for filing suit and

---

[22] *Id*. at 46-49.

[23] 421 Mich 571; 365 NW2d 170 (1985).

13

one limitation on the period for which benefits may be recovered:

> (1) An action for personal protection insurance [PIP] benefits must be commenced not later than one year after the date of accident, *unless* the insured gives written notice of injury or the insurer previously paid [PIP] benefits for the injury.

> (2) *If* notice has been given or payment has been made, the action may be commenced at any time within one year after the most recent loss was incurred.

> (3) Recovery is limited to losses incurred during the one year preceding commencement of the action.[24]

Thus, although a no-fault action to recover PIP benefits may be *filed* more than one year after the accident and more than one year after a particular loss has been incurred (provided that notice of injury has been given to the insurer or the insurer has previously paid PIP benefits for the injury), § 3145(1) nevertheless limits *recovery* in that action to those losses incurred within the one year preceding the filing of the action. It is this "one-year-back" provision that is at issue in this case.[25]

---

[24] *Id*. at 576 (emphasis in original).

[25] MCL 500.3141 permits an insurer to require written notice to be given "as soon as practicable" after an accident involving an insured motor vehicle. MCL 500.3142(2) provides generally that PIP benefits are overdue if not paid within thirty days after an insurer

14

The *Tom Thomas* judicial tolling doctrine was first applied to § 3145(1) by our Court of Appeals in *Richards v American Fellowship Mut Ins Co.*[26]   In *Richards*, the plaintiff insured filed an action to recover PIP benefits more than one year after the automobile accident in which he was injured, seeking to recover the balance of a hospital bill for a term of hospitalization that had ended more than one year prior to the commencement of the action. Rejecting the defendant insurer's defense that the one-year-back provision barred recovery, the Court held that the purpose of the no-fault law—that persons injured in automobile accidents be promptly and adequately compensated for their losses—required application of *Tom Thomas* tolling to § 3145(1):

> If we were to accept defendant's interpretation of the statutory provision, we would in effect be penalizing the insured for the time the insurance company used to assess its liability.  To bar the claimant from judicial enforcement of his insurance contract rights because the insurance company has unduly delayed in denying its liability would run counter to the

receives reasonable proof of the fact and amount of loss sustained.  Moreover, the insurer is subject to penalties for delaying payment: MCL 500.3142(3) provides for a twelve-percent annual interest rate on delayed payments, and MCL 500.3148(1) renders the insurer liable for a claimant's attorney fees if the court determines that "the insurer unreasonably refused to pay the claim or unreasonably delayed in making proper payment."

[26] 84 Mich App 629; 270 NW2d 670 (1978).

Legislature's intent to provide the insured with prompt and adequate compensation.

* * *

Applying the approach taken by the [*Tom*] *Thomas* Court to § 3145 would effectuate the legislative intent in enacting the no-fault act. Unable to profit from processing delays, insurance companies will be encouraged to promptly assess their liability and to notify the insured of their decision. At the same time, the insured will have a full year in which to bring suit.[27]

Accordingly, the *Richards* Court held that the one-year-back provision was tolled from the date that the plaintiff gave notice of loss until liability was formally denied by the defendant.

This Court first addressed judicial tolling of § 3145 in *Welton.* We held that, assuming arguendo that *Richards* was correct and that the judicial tolling doctrine should be applied to the one-year-back rule, the plaintiff's notice to the defendant insurer was insufficient to trigger *Tom Thomas* tolling of his no-fault claim. The *Welton* Court noted that it found the *Richards* analysis "persuasive."[28]

---

[27] *Id*. at 634-635.

[28] *Welton, supra* at 578. Although we recognized that MCL 500.3142(2) dictates that benefits are overdue if not paid within thirty days after a claim is submitted to an insurer, we ventured that, "[a]s a practical matter, . . . it appears unlikely that insureds will commence suit immediately because of the expense involved in bringing an

16

However, apparently recognizing the imbalance created by the judicially created tolling rule, the *Welton* Court stated that something more than a general notice of injury, such as the type submitted by the plaintiff in that case, should be required to trigger tolling; rather, tolling should not begin until a claim for specific benefits is submitted to the insurer:

> While a rule which protects insureds from delays attributable to their insurers is salutary, it also must be remembered that tolling represents a departure from the legislatively prescribed one-year-back cap on no-fault recoveries. Thus, any tolling of the statutory period would properly be tailored to prevent the former type of abuse while preserving the legislative scheme to the fullest possible extent.
>
> Tolling the statute when the insured submits a claim for specific benefits would not appear to detract from the policies underlying the one-year limitation on recovery. By submitting a timely and specific claim, the insured serves the interest in preventing stale claims by allowing the insurer to assess its liability while the information supporting the claim is relatively fresh. A prompt denial of the claim would barely affect the running of the limitation period, while a lengthy investigation would simply "freeze" the situation until the claim is eventually denied. In effect, the insured would be charged with the time spent reducing his losses to a claim for specific benefits plus the

---

action and the very real possibility that the claim will be paid without the necessity of legal action." *Id*. at 579 n 3.

time spent deciding whether to sue after the claim is denied.[29]

In *Lewis,* this Court was again presented with the question whether the judicial tolling doctrine should be extended to the one-year-back provision of § 3145(1). This time, we adopted the rule, drawn from *Richards* and *Welton*, that the one-year-back limitation is tolled from the time the insured makes a specific claim for benefits until the date that liability is formally denied. To this rule, we added the "caveat" that

> the insured must seek reimbursement with
> reasonable diligence or lose the right to claim
> the benefit of a tolling of the limitations

_____

[29] *Id*. at 578-579.

Interestingly, in further defense of limiting application of *Tom Thomas* tolling in the one-year-back context to those cases in which a claim for *specific benefits* was submitted, the *Welton Court* noted (1) the fact that § 3145(1) included a "built-in" tolling provision permitting later suit once notice was given or partial payment was made (in contrast to the fire insurance context, in which the limitations provision operated as an absolute bar to suits not brought within one year of discovery or inception of the loss); (2) the fact that the specified procedure for claim and recovery of fire insurance benefits included greater built-in delays than the no-fault law (some 150 days for fire insurance, versus the thirty-day payment requirement for no-fault benefits); and (3) the fact that the Legislature had already provided in § 3145(1) that tolling was triggered by "notice of injury," suggesting that notice of injury was to have no greater tolling effect. *Id*. at 580 n 4. None of these considerations apparently caused the *Welton* Court to reconsider the propriety of applying its tolling rule to MCL 500.3145(1).

18

> period. Such a condition should alleviate the defendant's fear that adoption of the tolling principle will result in "open-ended" liability in cases in which the claimant, having made a specific claim for benefits, thereafter refuses to respond to the carrier's legitimate requests for more information needed to process the claim.[30]

In adopting this modified tolling rule, *Lewis* explained that application of judicial tolling to the one-year-back limitation served the Legislature's purposes in enacting the no-fault law:

> Most persons are confident that, in the event of a loss, their insurer will pay their claim without the necessity for litigation. It is only when an insurer denies liability that it is unequivocally impressed upon the insured that the extraordinary step of pursuing relief in court must be taken. A contrary result today would require the prudent claimant to file suit as a precautionary measure when the one-year deadline approached, regardless of the status of the claim. In addition to requiring a level of sophistication many claimants may not possess, such an approach would encourage needless litigation. One of the important reasons behind the enactment of the no-fault system was the reduction of automobile accident litigation.[31]

Justice Brickley, joined by Justice Riley, vigorously dissented, noting that the majority's approach constituted an impermissible departure from the plain and unambiguous language of § 3145(1). With some prescience, Justice

---

[30] *Lewis, supra* at 102-103.

[31] *Id.* at 101-102.

19

Brickley predicted that "this judicial amendment of a clear legislative directive will have a pernicious long-term effect."[32] Justice Brickley further opined that the majority had supplanted the will of the Legislature with its own assessment of policy and consumer expectations:

> The majority observes that most people expect that insurance companies will pay their claims without having to begin litigation, and that it is only when a claim is formally denied that litigation will be necessary. The majority thus concludes that to follow the statute as written would require a claimant to file a suit as a "precautionary measure" when the one-year deadline approached. Although the majority approach may further the general policy of reducing litigation, the statute is not necessarily inconsistent with other purposes and provisions of the act. For example, §§ 3142 and 3148 impose sanctions upon an insurer for late payments. Thus, § 3145 may be viewed as a complementary provision which "sanctions" an insured who is not diligent in pursuing a claim. . . . This Court was not privy to all of the arguments and purposes presented to the Legislature when it drafted these specific tolling requirements. When statutory language is as clear as it is here, it is outside our province to second-guess the Legislature as to which policy is paramount in regard to § 3145.[33]

With respect to the majority's addition of a requirement that the insured pursue reimbursement with "reasonable diligence," Justice Brickley remarked that

---

[32] *Id.* at 104.

[33] *Id.* at 107-108.

"[t]he necessity for this addition demonstrates the fact that this Court has engaged in judicial legislation."[34]

Finally, Justice Brickley noted a curious incongruity in the majority opinion, as carried forward from *Welton*:

> The majority does not suggest that § 3145 contains any ambiguity or that the Legislature was not in full command of what it intended to do. To the contrary, the Legislature was cognizant of a need for some tolling. Again, as we said in *Welton, supra*, and as pointed out by the majority:
>
> "[T]he fact that the Legislature has already provided a tolling provision for commencing a no-fault action, triggered by 'notice of injury,' suggests both that notice of injury was intended to have no greater effect and that there is less justification for this Court to interfere with the statutory scheme. [*Welton, supra*, 580, n 4.]"[35]

In attestation of Justice Brickley's admonition that the *Lewis* rule would have far-reaching implications, our Court of Appeals in *Johnson v State Farm Mut Automobile Ins Co*[36] further extended the judicial tolling doctrine. The plaintiff's decedent in *Johnson* was insured under a motorcycle policy and an automobile policy, both written by the same agent and issued by the defendant insurer. Although the plaintiff immediately notified the agent of

---

[34] *Id*. at 108.

[35] *Id.*

[36] 183 Mich App 752; 455 NW2d 420 (1990).

the accident and requested coverage under the motorcycle policy, she did not specifically request payment of benefits under the automobile policy until shortly before filing suit, several years after the accident. Noting that this Court did not define in *Lewis* and *Welton* what constituted a "specific claim for benefits," the *Johnson* Court held that the plaintiff's notice of injury under the motorcycle policy constituted sufficient notice of a claim for PIP benefits under the automobile insurance policy, and that the § 3145(1) one-year-back provision was therefore tolled. Additionally, the Court announced a completely new, and quite broad, tolling rule:

> [E]ven if tolling under *Lewis, supra*, is not applicable to the case at bar, the one-year-back rule should nevertheless be tolled for that period from which defendant knew or reasonably should have known that plaintiff was entitled to benefits under the automobile policy until such time as defendant either formally and explicitly denied liability for benefits or affirmatively informed plaintiff that she might be entitled to benefits under the policy and requested that she file a formal claim of benefits under the policy.[37]

Thus, not only did the *Johnson* Court disregard *Lewis*'s admonition that a "specific claim" must be filed in order

---

[37] *Id*. at 762-763; see also *id*. at 765. The panel noted that "once the insured files such a claim, the provisions of *Lewis, supra*, apply and the one-year-back rule is *again* tolled until such time as that claim is denied." *Id*. at 765 n 4 (emphasis supplied).

to initiate tolling, the *Johnson* Court, in expanding the Lewis doctrine to include a vague "knew or should have known" standard, dismantled the certainty that the Legislature intended to create in enacting the one-year limitation.

### C. *LEWIS* MUST BE OVERRULED AS WRONGLY DECIDED

As is no doubt evident from the foregoing discussion of the questionable lineage of *Lewis*, as well as the expansion of the *Lewis* doctrine by our Court of Appeals, we are today compelled to overrule *Lewis* to reaffirm the Legislature's prerogative to set policy and our long-established commitment to the application of statutes according to their plain and unambiguous terms to preserve that legislative prerogative.

The long road leading to the judicial negation of the statutory one-year-back rule began with this Court's abrupt departure from settled precedent and adoption of the inapposite minority *Peloso* rule in *Tom Thomas*. Then, in *Ford*, finding ourselves "figuratively examining [our] own tail,"[38] we determined that it would be illogical to apply *Peloso* in the off-point *private* contract setting without also applying that rule in the context for which it was

---

[38] *Ford, supra* at 43 (Ryan, J., dissenting).

designed, the *statutory* fire insurance form setting.  Along the way, we shrugged off the weight of binding precedent, purporting to distinguish *Dahrooge* as a "narrow" decision that simply did not address the judicial tolling question.[39] Finally, we deigned in *Lewis*, purely for policy reasons and in direct contravention of the statutory language at issue, to extend application of *Tom Thomas* and *Ford* to the one-year-back rule of § 3145(1).  Our substitution of the "specific claim" rule and the addition of the "reasonable diligence" requirement to the *Tom Thomas/Ford* approach stand as testimony to the lengths to which the *Lewis* Court went in crafting its own amendment to § 3145(1).  Further distortion of the *Lewis* rule by our Court of Appeals in *Johnson* demonstrates the unmanageability of the judicial tolling doctrine and represents the  vitiation of the clear statutory directive limiting a PIP claimant's recovery to benefits for losses incurred one year or less before the date on which the action was commenced.

---

[39] See *Ford, supra* at 33 (noting that *Dahrooge* "did not attempt to reconcile the obvious incongruity between the proof-of-loss and payment provisions, and the limitation provision of the statute"); see also *Tom Thomas, supra* at 597 n 10 (disregarding *Dahrooge* as binding authority on the ground that it failed to reconcile the various policy terms at issue).

In short, we wholly agree with the views expressed by the dissenting justices in *Tom Thomas, Ford*, and *Lewis*. Statutory-or contractual-language must be enforced according to its plain meaning, and cannot be judicially revised or amended to harmonize with the prevailing policy whims of members of this Court. The *Lewis* majority impermissibly legislated from the bench in allowing its own perception concerning the lack of "sophistication" possessed by no-fault claimants, as well as its speculation that the average claimant expects payment without the necessity for litigation, to supersede the plainly expressed legislative intent that recovery of PIP benefits be limited to losses incurred within the year prior to the filing of the lawsuit.

Although a claimant may well find himself in a bind similar to that of the *Lewis* plaintiffs, and of the plaintiff in the case at bar, should that claimant delay the commencement of an action (as permitted by § 3145) more than one year beyond the accident leading to the injury, our observation is simply this: the Legislature has made it so. The *Lewis* Court acted outside its constitutional

authority[40] in importing its own policy views into the text of § 3145(1). "[T]he constitutional responsibility of the judiciary is to act in accordance with the constitution and its system of separated powers, by exercising the judicial power and only the judicial power."[41]

In any event, we are unable to perceive any sound policy basis for the adoption of a tolling mechanism with respect to the one-year-back rule. Although the Lewis majority, echoing the concerns of the *Tom Thomas* and *Ford* Courts, speaks of potential delays attributable to the "'lengthy investigation'" of a PIP claim,[42] the only delay possible under the no-fault law is the thirty-day payment period following receipt of proof of loss by the insurer.[43] To repeat Justice Ryan's query in *Ford*, "Where is the inconsistency?"[44]

---

[40] See Const 1963, art 3, § 2; See also Const 1963, art 6, § 1, directing the judiciary to exercise its "judicial power . . . ."

[41] *Nat'l Wildlife Federation v Cleveland Cliffs Iron Co,* 471 Mich 608, 637; 684 NW2d 800 (2004).

[42] *Lewis, supra* at 101, quoting *Welton, supra* at 578.

[43] MCL 500.3142(2). As noted by Justice Brickley in *Lewis, supra* at 107, the no-fault act requires the insurer to pay penalties for any delayed payment. See MCL 500.3142(3); MCL 500.3148(1).

[44] *Ford, supra* at 47 (Ryan, J., dissenting).

Just as the *Ford* plaintiff had many months, even after expiration of the potential delays permitted in the statutory fire insurance scheme, in which to file suit, plaintiff in the case at bar had a full year following the February 2001 termination of payment for home health-care benefits within which to seek reimbursement.  In no way was plaintiff's ability to file suit thwarted by dilatory tactics on the part of defendant or by the exercise of defendant's statutory right to delay payment for thirty days following receipt of proof of loss.  As soon as PIP payments stopped, plaintiff had the surest notice that her claim was no longer being honored by the insurer.

We conclude, therefore, that *Lewis* and its progeny were wrongly decided. We must decide whether the doctrine of stare decisis nevertheless obliges us to adhere to its holding.   Although stare decisis is generally "'the preferred course,'"[45] we will nevertheless depart from erroneous precedent "when governing decisions are unworkable or are badly reasoned."[46]  In determining whether stare decisis compels adherence to the *Lewis* tolling

_____

[45] *Robinson v Detroit*, 462 Mich 439, 463; 613 NW2d 307 (2000), quoting *Hohn v United States*, 524 US 236, 251; 118 S Ct 1969; 141 L Ed 2d 242 (1998).

[46] *Robinson, supra* at 464, citing *Holder v Hall*, 512 US 874, 936; 114 S Ct 2581; 129 L Ed 2d 687 (1994).

doctrine, we may examine, among other factors, the extent to which the *Lewis* Court erred; the "'practical workability'" of that decision; whether reliance interests would work an undue hardship if the decision were overruled; and whether changes in the law or facts no longer justify the questioned decision.[47]

*Lewis* does not reflect a simple "misunderstanding" of the statute at issue;[48] the *Lewis* decision demonstrates an act of judicial *defiance* in which this Court substituted its own judgment concerning "fairness" for the plainly expressed will of the Legislature. Such an act of judicial usurpation of the legislative function should not be permitted to stand.

Moreover, *Lewis* has not "become so embedded, accepted or fundamental to society's expectations that overruling [it] would produce significant dislocations."[49] Rather, it is highly likely that the average no-fault claimant who has profited from *Lewis* was quite unaware of this decision, and simply received a windfall in being permitted to collect benefits that the statute proclaims are

---

[47] *Robinson, supra* at 464; see also *Mitchell v W T Grant Co*, 416 US 600, 627-628; 94 S Ct 1895; 40 L Ed 2d 406 (1974).

[48] See *Robinson, supra* at 465.

[49] *Id*. at 466.

28

nonrecoverable.   We need not, and indeed *should* not, slavishly adhere to the doctrine of stare decisis where no legitimate reliance interest is affected.   As we noted in *Robinson,*

> if the words of the statute are clear, the actor should be able to expect, that is, rely, that they will be carried out by all in society, including the courts.   In fact, should a court confound those legitimate citizen expectations by misreading or misconstruing a statute, it is that court itself that has disrupted the reliance interest.   When that happens, a subsequent court, rather than holding to the distorted reading because of the doctrine of stare decisis, should overrule the earlier court's misconstruction. [50]

Additionally, the *Lewis* judicial tolling doctrine defies "practical workability," as evidenced by this Court's efforts to cabin tolling and by the confusion of the Court of Appeals in *Johnson.*   On the basis that *Lewis* failed to delineate what constituted a "specific claim for benefits," the *Johnson* Court took license to apply the judicial tolling doctrine to a situation that even the *Lewis* Court would presumably have found lacking. Furthermore, it appears that the impact of *Lewis* is increasingly producing a tax on the no-fault system as claimants are being permitted to seek recovery for losses incurred much more than one year prior to commencing suit.

---

[50] *Id*. at 467.

Thus, far from "produc[ing] chaos,"[51] overruling *Lewis* will *prevent* potential chaos by according insurers, and the public that funds the no-fault system through payment of premiums, the certainty that the Legislature intended.

We today overrule *Lewis* and its progeny as wrongly decided. The one-year-back rule of MCL 500.3145(1) must be enforced by the courts of this state as our Legislature has written it, not as the judiciary would have had it written.

D. RETROACTIVITY

In our order granting leave to appeal, we directed the parties to address whether a decision overruling *Lewis* should be given only prospective application.

Typically, our decisions are given retroactive effect, "applying to pending cases in which a challenge . . . has been raised and preserved."[52] Prospective application is a departure from this usual rule and is appropriate only in "exigent circumstances."[53] This case presents no "exigent

---

[51] *Id.* at 466 n 26.

[52] *Wayne Co v Hathcock*, 471 Mich 445, 484; 684 NW2d 765 (2004).

[53] *Id.* at 484 n 98.

30

circumstances" of the sort warranting the "extreme measure" of prospective-only application.[54]

As we reaffirmed recently in *Hathcock*, prospective-only application of our decisions is generally "'limited to decisions which overrule *clear and uncontradicted* case law.'"[55] *Lewis* is an anomaly that, for the first time, engrafted onto the text of § 3145(1) a tolling clause that has absolutely no basis in the text of the statute. *Lewis* itself rests upon case law that consciously and inexplicably departed from decades of precedent holding that contractual and statutory terms relating to insurance are to be enforced according to their plain and unambiguous terms.

Thus, *Lewis* cannot be deemed a "clear and uncontradicted" decision that might call for prospective application of our decision in the present case. Much like *Hathcock,* our decision here is not a declaration of a new rule, but a return to an earlier rule and a vindication of

---

[54] See *Gladych v New Family Homes, Inc*, 468 Mich 594, 606 n 6; 664 NW2d 705 (2003).

[55] *Hathcock, supra* at 484 n 98, quoting *Hyde v Univ of Michigan Bd of Regents,* 426 Mich 223, 240; 393 NW2d 847 (1986) (emphasis supplied).

31

controlling legal authority—here, the "one-year-back" limitation of MCL 500.3145(1).[56]

Accordingly, our decision in this case is to be given retroactive effect as usual and is applicable to all pending cases in which a challenge to *Lewis's* judicial tolling approach has been raised and preserved.[57]

E. RESPONSE TO JUSTICE CAVANAGH'S DISSENT

Given the characterization by Justice Cavanagh's dissent of the majority's position as "overwrought [with]

---

[56] *See Hathcock, supra* at 484.

[57] *Id.* In our case law, this form of retroactivity is generally classified as "limited retroactivity." See *Stein v Southeastern Michigan Family Planning Project, Inc*, 432 Mich 198, 201; 438 NW2d 76 (1989).

We disagree with Justice Weaver's assertion that our decision to overrule *Lewis* should be given prospective application. As we explained in *Hathcock, supra* at 484 n 97, to accord a holding only prospective application is, essentially, an exercise of the legislative power to determine what the law shall be for all *future* cases, rather than an exercise of the judicial power to determine what the existing law is and apply it to *the case at hand*. Const 1963, art 3, § 2 prohibits this Court from exercising powers properly belonging to another branch of government except when expressly authorized by the Constitution. As we further explained in *Hathcock, supra* at 484 n 98, prospective opinions are, in essence, advisory opinions, and our only constitutional authorization to issue advisory opinions is found in Const 1963, art 3, § 8, which does not apply in this case.

We also note, however, that payments properly made under *Lewis* prior to this opinion are not subject to recoupment or setoff.

32

scorn"[58] and an "outright fabrication,"[59] it is easy to lose sight of the fact that there is substantial agreement between Justice Cavanagh and the majority. Both the majority and Justice Cavanagh agree that the plain text of § 3145(1) provides that an insured "may not recover benefits for any portion of the loss incurred more than 1 year before the date on which the action was commenced." The fundamental difference between the position of the majority and Justice Cavanagh lies in how one perceives the judicial role.

The majority believes that statutes are to be enforced *as written*, unless, of course, a statute violates the Constitution. Such a view of the judicial role is not merely a preference shared by a majority of this Court, but rather a constitutional mandate.[60] Justice Cavanagh, on the other hand, apparently believes that a court's equitable power is an omnipresent and unassailable judicial trump card that can be used to rewrite a constitutionally valid statute simply because a particular judge considers the statute to be "unfair."

---

[58] *Post* at 34.

[59] *Id.*

[60] Const 1963, art 3, § 2 and art 6, § 1.

33

The view of the majority—that statutes are to be enforced as written unless they are unconstitutional—represents a more limited view of the role of the judiciary. It is grounded not just in the separation of powers mandate of our Constitution,[61] but also on prudential concerns. The majority believes that policy decisions are properly left for the people's elected representatives in the Legislature, not the judiciary. The Legislature, unlike the judiciary, is institutionally equipped to assess the numerous trade-offs associated with a particular policy choice. Justice Cavanagh, however, apparently believes that judges are omniscient and may, under the veil of equity, supplant a specific policy choice adopted on behalf of the people of Michigan by their elected representatives in the Legislature.[62] We could not disagree more.

---

[61] Const 1963, art 3, § 2.

[62] The fact that Justice Cavanagh is willing to make policy choices through a court's equitable powers is evident from his extensive discussion of the "costs" associated with enforcing the plain text of § 3145(1). *Post* at 12-14. While the majority believes that the Legislature is better equipped to evaluate the costs and benefits associated with a specific policy choice, and that the Legislature actually evaluated such trade-offs in enacting § 3145(1), Justice Cavanagh apparently believes that a judge is free to second-guess a legislative policy choice based on the judge's own preconceived notions of fairness.

Although courts undoubtedly possess equitable power,[63] such power has traditionally be reserved for "unusual circumstances" such as fraud or mutual mistake.[64]  A court's

Not surprisingly, Justice Cavanagh cites no support for his conclusion that enforcing the unambiguous language of § 3145(1) will increase costs to insurers and insureds. In fact, there has been no evidence presented to this Court on which such a determination could be made.  If anything, it would seem that the uncertainty associated with subjecting insurers and insureds to the whims of individual judges and their various conceptions of "equity" would *increase* overall insurance costs because insurers would no longer be able to estimate accurately actuarial risk.  See, e.g., Popik & Quackenbos, *Reasonable expectations after thirty years: A failed doctrine,* 5 Conn Ins L J 425, 431-432 (1998) ("When the courts invalidate unambiguous exclusions, the insurance industry's ability to calculate and manage risk is severely impaired.  The insurers' only alternative to this uncertainty is to hedge their bets by increasing premiums or restricting coverage."); Rappaport, *The ambiguity rule and insurance law: Why insurance contracts should not be construed against the drafter,* 30 Ga L R 171, 203 (1995) ("Uncertainty about how judges will interpret insurance contracts may significantly increase the costs of insurance."); Comment, *A critique of the reasonable expectations doctrine,* 56 U Chi L Rev 1461, 1489 (1989) ("'[J]udicial . . . intervention renders costs quite unpredictable and makes insurers fearful, tightening the market.'" [citation omitted]).

[63] Const 1963, art 6, § 5.

[64] *Cincinnati Ins Co v Citizens Ins Co,* 454 Mich 263, 270; 562 NW2d 648 (1997) (stating that this Court has been reluctant to recognize equitable estoppel, a corollary of fraud, "absent intentional or negligent conduct designed to induce a plaintiff from bringing a timely action.") (emphasis omitted); *Flynn v Korneffel*, 451 Mich 186, 199; 547 NW2d 249 (1996) ("this Court has exercised its equitable power in *unusual circumstances* such as fraud . . .") (emphasis in original); *Solo v Chrysler Corp (On Rehearing)*, 408 Mich 345, 352-353; 292 NW2d 438 (1980); *Panozzo v Ford Motor Co*, 255 Mich 149, 150-151; 237 NW 369

equitable power is not an unrestricted license for the court to engage in wholesale policymaking, as Justice Cavanagh implies.[65]

_____

(1931); _Gee v Gee_, 254 Mich 415, 416-417; 236 NW 820 (1931).

[65] Justice Cavanagh asserts that because we granted equitable relief in _Bryant v Oakpointe Villa Nursing Ctr, Inc,_ 471 Mich 411, 432; 684 NW2d 864 (2004), there is no reason not to apply equity in this case.  This argument illustrates the fundamental disagreement between a majority of this Court and Justice Cavanagh, as well as the _Lewis_ Court, concerning the proper application of equitable relief.

In _Bryant_, our grant of equitable relief was a pinpoint application of equity based on the particular circumstances surrounding the plaintiff's claim; namely, the preexisting jumble of convoluted case law through which the plaintiff was forced to navigate.  Accordingly, our limited application of equity in _Bryant_ was entirely consistent with the "unusual circumstances" standard for equitable relief discussed above.  In _Lewis_, however, the Court chose to adopt an a priori rule of equity without regard to the particular circumstances of litigants in a given case.  In granting blanket equity to an entire _class_ of cases, therefore, the _Lewis_ Court essentially rewrote § 3145(1). Such a categorical redrafting of a statute in the name of equity violates fundamental principles of equitable relief and is a gross departure from the proper exercise of the "judicial power." Const 1963, art 3, § 2 and art 6, § 1.  Accordingly, Justice Cavanagh's unmitigated praise for the _Lewis_ Court's holding is, in our view, quite misplaced.

Moreover, we note that, in _Bryant_, there was no controlling statute negating the application of equity. Instead, the disputed issue in _Bryant_—whether a claim sounds in medical malpractice or ordinary negligence—was controlled by this Court's case law.  On the other hand, in the present case, there is a statute that controls the recovery of PIP benefits:  § 3145(1).  Section 3145(1) specifically states that a claimant "may not recover benefits for any portion of the loss incurred more than 1

36

Section 3145(1) plainly provides that an insured "may not recover benefits for any portion of the loss incurred more than 1 year before the date on which the action was commenced." There has been no allegation of fraud, mutual mistake, or any other "unusual circumstance" in the present case. Accordingly, there is no basis to invoke the Court's equitable power. Justice Cavanagh errs, as did the *Lewis* Court, in assuming that equity may trump an unambiguous and constitutionally valid statutory enactment.

Indeed, if a court is free to cast aside, under the guise of equity, a plain statute such as § 3145(1) simply because the court views the statute as "unfair," then our system of government ceases to function as a representative democracy. No longer will policy debates occur, and policy choices be made, in the Legislature. Instead, an aggrieved party need only convince a willing judge to rewrite the statute under the name of equity. While such an approach might be extraordinarily efficient for a particular litigant, the amount of damage it causes to the separation of powers mandate of our Constitution and the overall structure of our government is immeasurable. Justice Cavanagh apparently sees no problem with using a court's

---

year before the date on which the action was commenced," and this Court lacks the authority to say otherwise.

37

equitable power in this manner. We, however, believe the judicial role to be far more limited than our colleague in dissent.[66]

The judicial philosophy of the majority has been the subject of much discussion from some in the bench and bar. This is entirely to be expected and is desirable in a vibrant, healthy republic. Yet, in his discourse on the flaws of the majority's judicial philosophy, Justice Cavanagh has avoided *his* responsibility of explaining his own *consistent* approach to interpretation. Parties before

---

[66] Justice Cavanagh also argues that "this case is an ideal candidate for applying the ... legislative reenactment rule." *Post* at 27. However, as we recently explained:

> [N]either "legislative acquiescence" nor the "reenactment doctrine" may "be utilized to subordinate the plain language of a statute." [*People v Hawkins*, 468 Mich 488, 507-510; 668 NW2d 602 (2003).] "Legislative acquiescence" has been repeatedly rejected by this Court because "Michigan courts [must] determine the Legislature's intent from its *words*, not from its silence." *Donajkowski v Alpena Power Co*, 460 Mich 243, 261; 596 NW2d 574 (1999). . . . "[I]n the absence of a clear indication that the Legislature intended to either adopt or repudiate this Court's prior construction, there is no reason to subordinate our primary principle of construction—to ascertain the Legislature's intent by first examining the statute's language—to the reenactment rule." [*Hawkins, supra*] at 508-509. [*Neal v Wilkes*, 470 Mich 661, 668 n 11; 685 NW2d 648 (2004).]

38

this Court, as well as the people of Michigan generally, have been clearly apprised over the years that the philosophy set forth in this opinion will constitute the process by which this Court interprets the law. Justice Cavanagh would do well to describe, with as much care as the majority, his own philosophy.

What, for example, are the standards upon which *he* is determined *consistently* to give meaning to the law in future cases coming before this Court? What are the standards upon which litigants can reasonably predict *his* future interpretations, the rule of law being dependent upon such predictability? What are the standards that *he* is prepared to articulate, *in advance of his decisions*, in order to communicate that his decisions are guided by the law and are not merely a function of the results that he might prefer in a given case? What are the standards upon which *he* would rely in order to ensure the appearance and reality of integrity in his judicial decision-making? What judicial principles does *he* represent beyond opposition to a philosophy that he wrongly characterizes as one of "automation-like textualist analysis"[67] of the law? The justices in the majority, by opinions such as this, have

---

[67] *Post* at 22.

addressed these questions. Justice Cavanagh should do the same.

Justice Cavanagh, no less than the justices in the majority, owes it to the people of Michigan to articulate the precise standards by which he attempts to do justice *under* the law.

### IV. Conclusion

Our decision in *Lewis* to apply a judicial tolling mechanism to the one-year-back limitation of MCL 500.3145(1) contravenes the unambiguous text of that statutory provision and represents an unconstitutional usurpation of legislative authority. Accordingly, *Lewis* and its progeny, *Johnson,* are overruled. Moreover, we perceive no reason to depart from the general rule that our decisions are to be given retroactive effect. Defendant is entitled to summary disposition to the extent that plaintiff's claim is barred by the one-year-back rule. Accordingly, we reverse the decision of the trial court and remand this case to that court for entry of an order of partial summary disposition for defendant consistent with this opinion.

> Robert P. Young, Jr.
> Clifford W. Taylor
> Maura D. Corrigan
> Stephen J. Markman

40

# STATE OF MICHIGAN

## SUPREME COURT

EVA DEVILLERS, as guardian and
conservator of Michael J. Devillers,

    Plaintiff-Appellee,

v                            No. 126899

AUTO CLUB INSURANCE ASSOCIATION,

    Defendant-Appellant.

_____

CAVANAGH, J. *(dissenting)*.

Contrary to the majority's refusal to recognize as much, equitable tolling[1] is a time-honored, purposeful, and carefully crafted rule of equity that is employed when rare but compelling circumstances so justify its use. In *Lewis v DAIIE*, 426 Mich 93; 393 NW2d 167 (1986), the latest case to fall prey to the majority's chopping block, this Court employed this important mechanism for critical and justifiable equitable reasons that the current majority

---

[1] "Equitable tolling" is also referred to as "judicial tolling," "the doctrine of *contra non valentem*," and, in shareholder suits, "the doctrine of adverse domination." Equitable tolling is usually discussed in the context of statutes of limitations. MCL 500.3145(1), in that it precludes recovering no-fault benefits incurred during a certain time period, is, for tolling purposes, no different than a statute of limitations.

carelessly relegates to oblivion under an overwrought—and unnecessary—cloak of textualism. What the majority unfortunately fails to recognize is that judicial tolling needs no basis in statutory language. It is an equitable measure. Thus, the majority's ardent devotion to the strict language of the statute is admirable, but really quite misplaced. As a result, the majority unnecessarily ties the judiciary's hands from importing measures of equity in situations that require it. Because I believe that the judicial tolling rule established in *Lewis* was well-reasoned and necessary, and because the majority has not established a persuasive reason for disregarding twenty years of stare decisis, I respectfully dissent.

### I. Equitable Tolling is an Equitable Remedy that Needs No Basis in Statutory Language

The long-recognized equitable remedy of judicial tolling has been applied in a variety of circumstances. In fact, "[t]ime requirements in lawsuits between private litigants are customarily subject to 'equitable tolling[.]'" *Irwin v Dep't of Veterans Affairs*, 498 US 89, 95; 111 S Ct 453; 112 L Ed 2d 435 (1990), quoting *Hallstrom v Tillamook Co*, 493 US 20, 27; 110 S Ct 304; 107 L Ed 2d 237 (1989). This "break[s] [no] new ground." *American Pipe & Constr Co v Utah*, 414 US 538, 558; 94 S Ct 756; 38 L

2

Ed 2d 713 (1974). Rather, equitable tolling operates to relieve the "strict command" of a legislatively prescribed limitation because of "considerations '[d]eeply rooted in our jurisprudence.'" *Id.* at 559, quoting *Glus v Brooklyn Eastern Terminal*, 359 US 231, 232; 79 S Ct 760; 3 L Ed 2d 770 (1959).

For instance, "in cases where the plaintiff has refrained from commencing suit during the period of limitation because of inducement by the defendant, [*Glus, supra*] or because of fraudulent concealment, *Holmberg v Armbrecht*, 327 US 392[; 66 S Ct 582; 90 L Ed 743 (1946)], this Court has not hesitated to find the statutory period tolled or suspended by the conduct of the defendant." *American Pipe, supra* at 559. See also *Irwin*, *supra* at 96 (recognizing that the remedy of equitable tolling can be afforded even where a plaintiff files a defective pleading within the statutory time period); *In re MGS*, 756 NE2d 990, 997 (Ind App, 2001) (recognizing that equitable tolling was an available remedy to a statute of limitations); *Harsh v Calogero*, 615 So2d 420, 422 (La App, 1993) (acknowledging the doctrine of *contra non valentem*); *Regents of the Univ of Minnesota v Raygor*, 620 NW2d 680, 687 (Minn, 2001), (holding that equitable tolling is an available equitable remedy under the proper circumstances), aff'd 534 US 533;

3

122 S Ct 999; 152 L Ed 2d 27 (2002); *Friedland v Gales*, 131 NC App 802, 806-809; 509 SE2d 793 (1998) (recognizing equitable estoppel of a statute of limitations defense); *Resolution Trust Corp v Grant*, 901 P2d 807, 812 nn 13, 16 (Okla, 1995) (noting that the doctrine of adverse domination is "widely applied" by federal courts, and collecting cases from eleven states recognizing the doctrine).

Most recently, our Michigan Court of Appeals observed the following:

> This Court in *United States Fidelity & Guaranty Co v Amerisure Ins Co*, 195 Mich App 1, 6; 489 NW2d 115 (1992), noted that "Michigan and federal case law provides precedent for the principle that limitation statutes are not entirely rigid, allowing judicial tolling under certain circumstances[.]"

> In *Bryant* [*v Oakpointe Villa Nursing Ctr, Inc*, 471 Mich 411, 432; 684 NW2d 864 (2004)], Justice Markman, writing for the majority, applied the principles of the doctrine of equitable tolling in a medical malpractice action, while not specifically referring to the doctrine by name[.]

> * * *

> Equitable tolling has been applied where "the plaintiff actively pursued his or her judicial remedies by filing a defective pleading during the statutory period or the claimant has been induced or tricked by the defendant's misconduct into allowing the filing deadline to pass." [*Ward v Rooney-Gandy*, 265 Mich App 515, 518-520; 696 NW2d 64 (2005), quoting 51 Am Jur 2d, Limitation of Actions, § 174, p 563.]

4

Thus, applying equitable tolling is neither a novel measure nor one employed by cunning judicial activists seeking to advance their personal philosophies, as the majority implies. Although equitable tolling must be sparingly applied, *Irwin*, *supra* at 96, equitable remedies are, nonetheless, entirely within the sanctioned parameters of the judiciary's powers. Indeed, when the circumstances dictate the need, it is the obligation of the judiciary to mete out the appropriate justice. See, e.g., *Howard v Mendez*, 304 F Supp 2d 632, 638-639 (MD Pa, 2004) (concluding that "common sense requires tolling of the limitations period when a litigant's right to file suit depends on the timely conduct of the opposing party's agent in assisting in the exhaustion of mandatory administrative remedies"); *Harris v Hegmann*, 198 F3d 153, 158-159 (CA 5, 1999) (recognizing a Louisiana "judicial rule" that tolls the limitations period during the time in which a plaintiff is legally unable to act).

The considerations behind equitable tolling tip the scales in favor of the remedy even when a statute requires strict construction and the tolling will result in the waiver of governmental immunity. For example, in *Irwin*, *supra* at 95-96, the United States Supreme Court found that statutes of limitations that operated against the

5

government, like those that operate against private parties, should be subject to the already existing rebuttable presumption of equitable tolling. This was true despite the fact that the civil rights statute at issue, 42 USC 2000e-16(c), had to be strictly construed because compliance with the statute was a condition to a waiver of sovereign immunity. *Irwin, supra* at 94. The Supreme Court duly recognized that "'Congress was entitled to assume that the limitation period it prescribed meant just that period and no more.'" *Id.*, quoting *Soriano v United States*, 352 US 270, 276; 77 S Ct 269; 1 L Ed 2d 306 (1957). But despite this important restriction, the Court found that the period of limitations should be equitably tolled when the circumstances of a particular case warranted it. The Court explained that although this type of equitable relief should be afforded only in rare instances, it is justified "in situations where the claimant has actively pursued his judicial remedies by filing a defective pleading during the statutory period, or where the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass." *Id.* at 96; see also 51 Am Jur 2d, Limitation of Actions, § 174, p 563 ("The time requirements in lawsuits between private litigants are

6

customarily subject to equitable tolling if such tolling is necessary to prevent unfairness to a diligent plaintiff.").[2]

Equitable tolling is precluded, however, if a claimant does not "exercise due diligence in preserving his legal rights." *Irwin*, *supra* at 96, citing *Baldwin Co Welcome Ctr v Brown*, 466 US 147, 151; 104 S Ct 1723; 80 L Ed 2d 196 (1984). With regard to the particular claim before it in *Irwin*, the Supreme Court found that the plaintiff's untimeliness was "at best a garden variety claim of excusable neglect," and, thus, equitable tolling was not available in that circumstance. *Irwin, supra* at 96.

Of course, equitable tolling must be consonant with the legislative purpose of a statute to which it is applied. *American Pipe*, *supra* at 559, see also 54 CJS, Limitations of Actions, § 86, p 122 ("In order to serve the ends of justice where technical forfeitures would unjustifiably prevent a trial on the merits, the doctrine of equitable tolling may be applied to toll the running of the statute of limitations, provided it is in conjunction

_____

[2] Indeed, the majority explicitly recognizes that equitable tolling is necessary in exactly the type of circumstance described in *Irwin* and 51 Am Jur 2d, p 563. See *ante* at 35 n 64, citing *Cincinnati Ins Co v Citizens Ins Co*, 454 Mich 263, 270; 562 NW2d 648 (1997). Its failure, discussed later in this opinion, is in refusing to acknowledge that this case presents exactly this type of circumstance.

with the legislative scheme."). And the legislative branch is free to indicate that it does not want equitable tolling to apply to any particular statute. *Irwin*, *supra* at 96. In the absence of such an indication here, equitable tolling is available, as long as the reasons for applying the remedy serve a justifiable purpose and comport with legislative intent.

## II. Applying Equitable Tolling to MCL 500.3145(1) is Necessary to Prevent Unjust Results and to Effect Legislative Intent

In *Lewis*, this Court thoroughly examined the purposes of statutes of limitations, the purposes of and legislative intent behind the no-fault act, and the parameters and conditions of employing equitable tolling before invoking the delicately chosen remedy. This Court did not misapprehend that the statute at issue was in some way ambiguous or that the text of the statute contained a tolling requirement.[3] Rather, after careful consideration,

---

[3] After this Court applied judicial tolling to MCL 500.3145(1) in *Lewis*, this Court considered whether judicial tolling was also applicable to MCL 500.3145(2). *Secura Ins Co v Auto-Owners Ins Co*, 461 Mich 382; 605 NW2d 308 (2000). In refusing to apply tolling to subsection 2, the *Secura* majority misunderstood the *Lewis* majority's reasoning. The *Secura* majority stated, "The *Lewis* majority recognized tolling under subsection 1. However, that subsection includes language indicating that the Legislature intended that the one-year limitation period would be suspended by the giving of notice[.]" *Id.* at 386.

we concluded that an equitable measure was necessary to further the purposes of the no-fault act and to eliminate the statute's inherent blockade to an insured's right to receive what is rightfully his.

Nothing about the purpose of the act, the purpose of the time limitation in the act, or the parameters of equitable tolling have changed since *Lewis* to justify overruling that well-reasoned case. Tellingly, the only variable that has fluctuated is the makeup of this Court.

As we recognized in *Lewis*, one of the foremost underlying purposes of our no-fault scheme was to reduce litigation. *Lewis*, *supra* at 101-102, citing *Welton v Carriers Ins Co*, 421 Mich 571, 578-579; 365 NW2d 170 (1984). Of equal importance, the act

> was offered as an innovative social and legal response to the long payment delays, inequitable payment structure, and high legal costs inherent in the tort (or "fault") liability system. The goal of the no-fault insurance system was to provide victims of motor vehicle accidents *assured, adequate, and prompt* reparation for certain economic losses. [*Shavers v Attorney General*, 402 Mich 554, 578-579; 267 NW2d 72 (1978) (emphasis added).]

---

As I noted in my dissent, "A careful reading of *Lewis*, however, reveals that the basis of our decision there was preserving legislative purposes, and not the sentence the majority highlights. . . . Thus, the majority relies on a phantom distinction to differentiate the instant case from *Lewis*, because applying the same analysis used in *Lewis* supports tolling the statute." *Secura*, *supra* at 389 n 1 (Cavanagh, J., dissenting).

The portion of the no-fault act at issue in *Lewis* and being reexamined in the present case, MCL 500.3145(1), governs when an insured must bring suit to recover benefits due under the act. The statute states in pertinent part:

> An action for recovery of personal protection insurance benefits payable under this chapter for accidental bodily injury may not be commenced later than 1 year after the date of the accident causing the injury unless written notice of injury as provided herein has been given to the insurer within 1 year after the accident or unless the insurer has previously made a payment of personal protection insurance benefits for the injury. *If the notice has been given or a payment has been made, the action may be commenced at any time within 1 year after the most recent allowable expense, work loss or survivor's loss has been incurred. However, the claimant may not recover benefits for any portion of the loss incurred more than 1 year before the date on which the action was commenced.* [*Id.* (emphasis added).]

Simply stated, an insured who has received benefits or requested his insurer to pay recoverable expenses has one year after the most recent allowable expense or loss was incurred to sue the insurer to recover those benefits. Thus, as long as expenses are being incurred, the time for bringing a lawsuit is not restricted. However, the insured will only be permitted to recover benefits that were incurred in the one-year period before the suit was brought.

Once an insured submits a claim for benefits, she has no way of knowing, other than an indication from the insurer, whether the claim will be paid. Quite obviously, then, when an insured acts with due diligence in notifying the insurance company of a claim, whether the insured ultimately collects the full amount of benefits due is completely at the whim of the insurance company. When an insured submits a claim for benefits, an insurer can take as long as it wants to approve or deny the claim. If the insurer takes more than one year, then under the one-year-back rule, the benefits that were due to the insured dissipate into thin air through no fault whatsoever of the insured.

Indeed, that was precisely what occurred in this case. After plaintiff's son was catastrophically injured in an automobile accident, defendant began paying plaintiff for her attendant care services. Defendant paid those benefits for approximately a year and a half. But a day after receiving a February 15, 2001, physician's notice that Michael had been "cleared to function without close supervision," defendant abruptly stopped paying benefits. Defendant waited, however, until October 7, 2002, to notify plaintiff that it was formally denying further benefits.

Shortly thereafter, on November 12, 2002, plaintiff filed a complaint to recover the benefits defendant had ceased paying.[4] But under MCL 500.3145(1), plaintiff could only recover benefits from the one-year period that preceded her complaint, November 12, 2001, to November 12, 2002, even though defendant allegedly wrongfully withheld benefits beginning on February 16, 2001. Thus, if plaintiff was entitled to benefits from the period February 16, 2001, to November 12, 2001, the one-year-back rule precluded her from recovering them, even though plaintiff was allegedly diligent in providing notice of her claim to her insurer.[5]

Plaintiff's case aptly demonstrates the need for equitable tolling. Her insurer waited nearly two years to formally deny her claim for attendant benefits. Although plaintiff *could* have brought suit earlier, before defendant

---

[4] Defendant ultimately resumed paying the benefits on October 15, 2003.

[5] Defendant claims that plaintiff did not notify it of her claim. Plaintiff presented evidence of a claims adjuster's notes that suggest that plaintiff did notify defendant. Moreover, defendant was already paying attendant care benefits and stopped after it received information that it claims relieved it of its obligation to pay further benefits. Thus, it is difficult for me to conclude that defendant had no notice of plaintiff's claim for benefits. In any event, whether plaintiff properly notified defendant would be a factual matter to be resolved on remand.

12

formally denied her claim, such a tactic hardly advances our Legislature's goal of *reducing* litigation. In fact, it appears from the limited record before us that plaintiff and defendant were involved in extensive dealings and communication regarding many types of benefits from the time plaintiff's son was injured onward.[6] An insured engaged in the complex day-to-day dealings with an insurer that are common after a serious accident would quite conceivably destroy any semblance of goodwill and cooperation by filing a lawsuit before the insurer has even denied a particular claim. Further, an insurer could simply defend by stating that the plaintiff's claim is premature because the insurer is still investigating the claim, at which point the lawsuit would not only have

---

[6] The majority claims that defendant's cessation of payments gave plaintiff the "surest notice" that it would not be honoring her claim for benefits. *Ante* at 27. This simplistic approach fails to account for the inherent complexities of no-fault claim resolution. In many cases involving extensive injuries, there are hundreds if not thousands of claims for different types of benefits presented for payment, and there are extensive negotiations, resubmissions, evaluations, investigations, and the like. Thus, to conclude that an insurer's denial of one such claim among many is the "surest notice" that the claim will not be paid misrepresents reality. In essence, the majority's statement merely emphasizes that a preemptive lawsuit is *expressly* necessary under its new rule.

13

precipitated antagonism, but would have amounted to a colossal waste of time and resources.

Insurers, too, are hurt by today's ruling. With the proliferation of litigation that is now bound to occur, insurers will be paying the costs of defending the lawsuits, and converting resources that could otherwise go toward investigating claims and communicating with their insureds into payments for billable hours. This will, in turn, translate into higher premiums, further denigrating the opposite goal of the no-fault act.

How the majority's abandonment of equitable tolling in this situation furthers the legislative intent behind the no-fault act escapes me.

Defendant claims that a deterrent mechanism that would encourage an insurer to promptly deny claims is built into the no-fault act and that, as such, equitable tolling is unnecessary. I disagree. While §§ 3142(3) and 3148(1) penalize the insurer for unreasonable delay or unreasonable denials by attaching interest to overdue payments and making the insurer liable for an insured's attorney fees, those provisions fall short of protecting insureds against the unavoidable effects of insurer delay. Once benefits become unreachable through operation of the one-year-back rule, the benefits cannot form a part of a plaintiff's

14

claim.  Thus, they cannot be a part of the plaintiff's award.  Therefore, not only is the plaintiff deprived of a part of her benefits, she is also deprived of the purportedly punitive interest that should have accompanied it.

Further, a savvy insurer seeking to disburse the lowest dollar amount possible might gamble on a cost-benefit approach and use the one-year-back rule in its favor.  For example, assume an insured seeks benefits that, over one year, total $100,000.  If the insurer waits two years to deny the claim, the insured, although due $200,000, can only recover $100,000 in a lawsuit.  A twelve percent annual interest rate will be applied to the $100,000 figure pursuant to § 3142(3), which makes the insurer's total bill approximately $112,000.  Thus, the insurer handily pockets $88,000 of its insured's benefit money, less the plaintiff's attorney fees.  Either way, the insured ends up with $112,000 instead of the $200,000, plus interest, that was actually owed.[7]

---

[7] This assumes that the insured can successfully engage an attorney's services.  If the amount of the potential claim does not significantly exceed the cost of litigation, then, presumably, getting an attorney will be a difficult endeavor.

15

Lest anyone argue otherwise, the danger of such a scenario is real, not imagined. In *Hudick v Hastings Mut Ins Co*, 247 Mich App 602, 610; 637 NW2d 521 (2001), the Court of Appeals found an acute need for *Lewis*'s equitable tolling rule when, "[a]lthough defendant had all the information it needed at this point to calculate the benefits it owed to plaintiff, defendant did not process a claim for plaintiff or formally deny its liability until" a time that precluded the plaintiff from recovering some of the benefits owed. The *Hudick* panel correctly observed that the "[p]laintiff should not be penalized for the time that the two insurers spent investigating the issue, which was extended largely because defendant was aware of its statutory duty but attempted to run the clock on the limitations period." *Id.* Such tactics were also forewarned in *William H Sill Mortgages, Inc v Ohio Cas Ins Co*, 412 F2d 341, 346 (CA 6, 1969) ("The insurer may not lull the insured to sleep by promises of payment or negotiations for payment or a failure to deny liability until after the time limitation has expired and then set up as a defense the failure to bring the action within the limitation fixed by the policy.").

The majority claims that the "only delay *possible* under the no-fault law is the thirty-day payment period

16

following receipt of proof of loss by the insurer." *Ante* at 26 (emphasis added). This is incorrect. While § 3142(2) does technically require insurers to pay benefits within thirty days, insurers do not always do so. Thus, delays of more than thirty days are indeed "possible."

The ways in which equitable tolling fulfill the purposes of the no-fault act, and the unjustifiable ramifications of disallowing the remedy, have been eloquently presented in precedent. In *Richards v American Fellowship Mut Ins Co*, 84 Mich App 629, 635; 270 NW2d 670 (1978), the Court of Appeals stated:

> Applying the approach taken by the *Thomas* Court [*Tom Thomas Org, Inc v Reliance Ins Co*, 396 Mich 588; 242 NW2d 396 (1976)] to § 3145 would effectuate the legislative intent in enacting the no-fault act. Unable to profit from processing delays, insurance companies will be encouraged to promptly assess their liability and to notify the insured of their decision. At the same time, the insured will have a full year in which to bring suit.

The *Richards* Court recognized the ramifications of disallowing tolling:

> If we were to accept defendant's interpretation of the statutory provision, we would in effect be *penalizing the insured for the time the insurance company used to assess its liability*. To bar the claimant from judicial enforcement of his insurance contract rights because the insurance company has unduly delayed in denying its liability would run counter to the Legislature's intent to provide the insured with

17

prompt and adequate compensation. [*Id.* at 634 (emphasis added).]

In *Lewis*, this Court correctly found that equitable tolling served the inherent purposes of the no-fault act by ensuring that an insurer's delay in handling a claim would not work to the insured's detriment:

> "Tolling the statute when the insured submits a claim for specific benefits would not appear to detract from the policies underlying the one-year limitation on recovery. By submitting a timely and specific claim, the insured serves the interest in preventing stale claims by allowing the insurer to assess its liability while the information supporting the claim is relatively fresh. A prompt denial of the claim would barely affect the running of the limitation period, while a lengthy investigation would simply 'freeze' the situation until the claim is eventually denied. In effect, the insured would be charged with the time spent reducing his losses to a claim for specific benefits plus the time spent deciding whether to sue after the claim is denied." [*Lewis*, *supra* at 101, quoting *Welton*, *supra* at 578-579.]

This Court also correctly recognized that without tolling, an insured will have to "file suit as a precautionary measure when the one-year deadline approache[s], regardless of the status of the claim," and that such needless litigation contravenes the no-fault act's purpose of reducing litigation. *Lewis, supra* at 102, citing *Cassidy v McGovern*, 415 Mich 483, 501; 330 NW2d 22 (1982).

18

Of course, equitable tolling is not "an unconditional gift to the insured." *Norfolk & W R Co v Auto Club Ins Ass'n*, 894 F2d 838, 843 (CA 6, 1990). Astute about the need to prevent an insured from improperly benefiting from equitable tolling, the *Lewis* Court also warned that to take advantage of tolling, the insured "must seek reimbursement with reasonable diligence . . . ." *Lewis, supra* at 102. That condition, held the Court, would "alleviate the defendant's fear that adoption of the tolling principle will result in 'open-ended' liability in cases in which the claimant, having made a specific claim for benefits, thereafter refuses to respond to the carrier's legitimate requests for more information needed to process the claim." *Id.* at 102-103.[8]

Further, it is nothing short of illogical not to require an insurer to deny a claim before imposing a restriction on what plaintiff can recover. A plaintiff must know that a claim exists before being required to file one. Repudiating equitable tolling imposes a tremendous

---

[8] In light of the majority's renegade renunciation of equitable tolling, it is unnecessary to address the correctness of the Court of Appeals decision in *Johnson v State Farm Mut Automobile Ins Co*, 183 Mich App 752; 455 NW2d 420 (1990). Thus, I make no conclusions regarding whether the Court of Appeals correctly interpreted *Lewis*'s requirement that an insured make a "specific claim for benefits."

burden on plaintiffs, who must assert that the insurer's failure to pay is a definitive denial and, thus, a violation of the no-fault act, rather than just the result of a pending investigation. A defense motion for failure to state a claim puts a plaintiff in an unnecessarily precarious position.

These many concerns are not lost on other states that have been faced with similar problems. In *Entzion v Illinois Farmers Ins Co*, 675 NW2d 925, 929 (Minn App, 2004), the court concluded that the period of limitations on a no-fault benefits claim did not begin to run until the insurer denied benefits. In *Micha v Merchants Mut Ins Co*, 94 AD2d 835; 463 NYS2d 110, 112 (1983), the court determined that the period of limitations started when benefits were withheld. Both courts recognized that it would be irrational to require a plaintiff to prove that benefits were owed before an insurer actually refused to pay them. Refusing to apply equitable tolling to § 3145 requires plaintiffs to sue defensively, creating an irreconcilable conflict with the legislative goal of reducing litigation.

Interestingly, the necessity for equity of this sort has been recognized by this very majority most recently in *Bryant v Oakpointe Villa Nursing Ctr, Inc*, 471 Mich 411;

20

684 NW2d 864 (2004). In *Bryant,* this Court concluded that the "[p]laintiff's failure to comply with the applicable statute of limitations [was] the product of an understandable confusion about the legal nature of her claim, rather than a negligent failure to preserve her rights." *Id*. at 432. Thus, this Court held that, although the plaintiff's claims would have normally been time-barred, "[t]he equities of this case . . . compel a different result." *Id*.

If the judiciary can employ its powers to toll a period of limitations because the nature of one's claim is a source of confusion, then certainly here, where an insurer can single-handedly orchestrate a reduction in genuinely owed benefits, equity is likewise required. The majority's newfound hostility to the doctrine is vastly disturbing.[9]

---

[9] The majority attempts to explain away this discrepancy by arguing that because there is no statute to assist one in characterizing a cause of action, equity was appropriate in *Bryant. Ante* at 36 n 65. Strangely, the *Bryant* plaintiff's situation—"confusion"—fits less within the majority's declaration of when equity should be applied ("fraud or mutual mistake," *ante* at 35), than does the statute at hand, which allows an insurer to single-handedly divest a plaintiff of deserved benefits even when a plaintiff has diligently performed all her obligations. Thus, this is far from the lofty "fundamental disagreement" between the majority and myself regarding when equity should be applied that the majority proclaims. *Ante* at 36

21

Further, the majority's automaton-like textualist analysis takes no consideration of the realities surrounding no-fault claims and payments illustrated by amicus curiae Coalition Protecting Auto No-Fault. For instance, when an insured does not file a lawsuit within one year of receiving medical treatment, the insured's medical providers may go unpaid, merely because the insurer has not responded to the request for benefits. This risk of nonrecovery or substantially reduced payments may prove too great for providers to bear. Medical providers may resort to denying treatment to and even suing their own patients, many of whom will not be able to pay because of the high cost of medical care, and some of whom may be forced into bankruptcy because of the debt. The overflow of health-care costs will be foisted on our already

n 65. Rather, the majority's inconsistency is a clear manifestation of its willingness to apply equity according to its own whims instead of according to the principles that govern it.

Further, it is misleading to suggest that the *Lewis* Court issued a protective blanket of equity to every plaintiff encountering a problem under MCL 500.3145(1). See *ante* at 36 n 65. The *Lewis* Court's conditions that a plaintiff must submit a specific claim for benefits and be diligent necessitate a case-by-case examination of whether a particular plaintiff can avail herself of the equitable rule. In other words, not every plaintiff will be permitted to benefit from equitable tolling. Rather, the *Lewis* Court made the remedy *potentially* available to plaintiffs, but only when they met certain conditions.

22

overtaxed Medicaid and Medicare systems, with the taxpayers ultimately shouldering the burden.  Thus, refusing to apply equitable tolling will ultimately increase overall health-care costs for everyone, denigrating yet another goal of the no-fault system:  affordable premiums.

In its response to my dissent, the majority does a fine job of describing the principles of equity. Noticeably lacking, however, is any attempt to describe why equity is not required in the present case.[10]  The majority's chosen ignorance of the fact that its application of the statute at hand does *not* further the intent of the Legislature or the purpose of the no-fault act, and that it unjustifiably puts an insured's ability to

---

[10] The majority's statement that there are no "'unusual circumstance[s]'" in this case is conveniently conclusory and, again, a variation on its dodge-and-duck theme.  See *ante* at 37.  I invite the public to reconcile the following premises of the majority.  The majority claims that its charge is to further legislative intent.  But it also claims that the only method of divining that intent is through the statute's plain language.  (It also assumes that this is possible with one-hundred percent "accuracy," though split decisions from this very majority belie that assumption.)  And it further claims that it can, indeed, employ equity.  But it fails to explain how it could ever invoke its equitable powers if it limits itself to the statute's plain language.  It then turns a blind eye to the fact that its analysis does not further the well-known and consistently agreed-on legislative intent behind the no-fault act.

recover benefits in an insurer's hands, is convenient for the majority, but disturbing to me.

The application of equitable tolling strikes an extremely palatable balance between the rights of insureds and insurers.[11] As I stated in *Secura*:

> The legislative purposes behind limitation provisions, preventing stale claims and easing crowded dockets, are either inapplicable or contrary to the majority's decision. First, preventing stale claims from reaching our courts is not a consideration in this case, because the defendant insurer can protect itself from stale claims by promptly responding to a policyholder's claim. Thus, whether insurers must deal with stale claims is uniquely within their own control. Next, the majority's interpretation actually encourages needless litigation. Under the majority's decision, a prudent policyholder must file suit within one year of the injury, regardless of whether the insurer is still processing the claim, or lose the claim altogether. This contravenes an important motivation for the no-fault system, reducing litigation, see *Cassidy v McGovern*, 415 Mich 483, 501; 330 NW2d 22 (1982), and the similar judicial policy of discouraging litigation. See *Alexander v Gardner-Denver Co*, 415 US 36; 94 S Ct 1011; 39 L Ed 2d 147 (1974). Additionally, requiring a precautionary suit by the policyholder could adversely affect the negotiations between the claimant and the insurer. Negotiating parties usually attempt to maintain a cooperative atmosphere, and litigation pending between the parties would hinder that atmosphere. See *Johnson v Railway Express Agency*, 421 US 454, 468; 95 S Ct 1716; 44 L Ed 2d 295 (1975)

---

[11] This is evidenced by the sheer number of courts that have held likewise, cited earlier in this opinion.

24

(Marshall, J., dissenting).  [*Secura*, *supra* at 391 (Cavanagh, J., dissenting).][12]

Defendant's magniloquent predictions of the demise of our entire no-fault system barring reversal of *Lewis* are sheer melodrama.  First, *Lewis* was decided nearly twenty years ago, and no-fault remains alive and well.[13]  Surely if equitable tolling were destined to bring our no-fault system to its knees, the system would be six feet under by now.  Second, defendant claims that the prolific number of multimillion dollar claims being wreaked on the insurance companies as a result of equitable tolling create great pressure on insurers to settle.  But an insurer is in the best position to avoid the accrual of multimillion dollar claims by promptly paying or denying benefits.  Further, the *Lewis* decision does not allow an insured to sleep on his rights, as evidenced by the numerous decisions in which plaintiffs who did not diligently pursue their claims were denied the benefit of equitable tolling and those in which the insurer's prompt denial prevented tolling.  See, e.g.,

---

[12] See also *Bridges v Allstate Ins Co*, 158 Mich App 276, 280-281; 404 NW2d 240 (1987), in which the Court noted that, although the "plaintiff filed a complaint, he wished to avoid the necessity of trying the action and felt that there was a very real possibility that his claim would be paid."

[13] I use that term as a figure of speech, not as a literal comment on the no-fault system.

*Bomis v Metropolitan Life Ins Co*, 970 F Supp 584, 588 (ED Mich, 1997) (rejecting the plaintiff's *Lewis* argument because the plaintiff did not act with due diligence); *Morley v Automobile Club of Michigan*, 458 Mich 459, 470; 581 NW2d 237 (1998); *Grant v AAA Michigan/Wisconsin, Inc*, 266 Mich App ____; ____ NW2d ____ (2005); *Mt Carmel Mercy Hosp v Allstate Ins Co*, 194 Mich App 580, 587-588; 487 NW2d 849 (1992); *Mousa v State Auto Ins Cos*, 185 Mich App 293, 294-295; 460 NW2d 310 (1990) (finding a formal denial of benefits when the plaintiff admitted that the insurer had orally denied the claim); *Long v Titan Ins Co*, unpublished opinion per curiam of the Court of Appeals, issued June 14, 2005 (Docket No. 260113); *Detroit Medical Ctr-Sinai-Grace Hosp v Titan Ins Co*, unpublished opinion per curiam of the Court of Appeals, issued March 10, 2005 (Docket No. 251447); *Inhulsen v Citizens Ins Co*, unpublished opinion per curiam of the Court of Appeals, issued March 30, 2004 (Docket No. 243398); *Jevahirian v Progressive Cas Ins Co*, unpublished opinion per curiam of the Court of Appeals, issued April 27, 1999 (Docket No. 205577) ("Notice of an injury that simply informs the insurer of the name and address of the claimant and the time, place, and nature of an injury cannot serve as the specific claim that triggers tolling because it does not inform the insurer of the

expenses incurred, whether the expenses were covered losses, and whether the claimant would file a claim.").

In other words, equitable tolling has worked. As can clearly be seen, equitable tolling puts neither the insured nor the insurer in an untenable or unfair position. Rather, it protects both parties by requiring both to act promptly. When a party fails to act promptly, the law will not reward that party. With these safeguards in place, the purposes of the no-fault act are realized instead of defeated. But with the majority's obstinate rejection of equitable tolling will come the temptation to prolong denying claims, lost benefits, a proliferation of litigation, unpaid providers, and increased costs for everyone. Such a ruling is simply unjustifiable.

### III. The Legislature Has Not Revised MCL 500.3145 Since *Lewis*

Despite amending the no-fault act several times since this Court's decision in *Lewis*, the Legislature has left untouched the language at issue in this case. Thus, this case is an ideal candidate for applying the long-recognized legislative reenactment rule. See, e.g., *Massachusetts Mut Life Ins Co v United States*, 288 US 269, 273; 53 S Ct 337; 77 L Ed 739 (1933). As I have previously explained,

> [u]nder the reenactment rule, "[i]f a legislature reenacts a statute without modifying a high

27

court's practical construction of that statute, that construction is implicitly adopted." *People v Hawkins*, 468 Mich 488, 519; 668 NW2d 602 (2003) (Cavanagh, J., dissenting), citing 28 Singer, Statutes and Statutory Construction (2000 rev), Contemporaneous Construction, § 49.09, pp 103-112. The Legislature "is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it [reenacts] a statute without change . . . ." *Lorillard, a Div of Loew's Theatres, Inc v Pons*, 434 US 575, 580; 98 S Ct 866; 55 L Ed 2d 40 (1978). "The reenactment rule differs from the legislative-acquiescence doctrine in that the former canon provides 'prima facie evidence of legislative intent' by the adoption, without modification, of a statutory provision that had already received judicial interpretation." *Hawkins*, *supra* at 488, quoting Singer at 107. [*Neal v Wilkes*, 470 Mich 661, 676; 685 NW2d 648 (2004) (Cavanagh, J., dissenting).]

I continue to find extremely persuasive the notion that a Legislature is presumed to be aware of this Court's decisions. *Id.*; see also *Lindahl v Office of Personnel Mgt*, 470 US 768, 782; 105 S Ct 1620; 84 L Ed 2d 674, (1985). Further, if the ramifications of *Lewis* were so dramatically detrimental to the no-fault system, there is all the more reason that the Legislature would have acted with great haste to amend the statute and explicitly ban equitable tolling. But it did not. Rather, despite numerous opportunities, the Legislature has left § 3145 intact. Its failure to change the statute to reflect an intent contrary to that which we found in *Lewis* is further

28

support that this Court correctly concluded that equitable tolling was appropriate.

### IV. The Majority's Reasoning for Failure to Adhere to Stare Decisis is Faulty

The majority's opinion seems to rest primarily on its analytically deficient conclusion that this Court should not employ equity in this case. Most egregiously, the majority accuses the *Lewis* Court of "act[ing] outside its constitutional authority," *ante* at 25-26, while at the same time acknowledging this Court's constitutional authority to do equity, *ante* at 35. The majority cites our Constitution's directive that the judiciary must "exercise its 'judicial power,'" see *ante* at 26 n 40, quoting Const 1963, art 3, § 2; art 6, § 1, but neglects to justify its conclusion that equity should not lie in the present case.

Indeed, despite its purported recognition that this Court's equitable powers are, in fact, viable, the majority insists on trivializing my application of these powers. The majority grossly mischaracterizes my analysis as playing "an omnipresent and unassailable judicial trump card," the result of my believing the statute is "unfair," a "policy decision[]," "omniscien[ce]," a "veil," a "policy choice," "second-guess[ing]," a "whim[]," one of "various conceptions," an "unrestricted license," "wholesale

29

policymaking," without "basis," and a "guise."  See *ante* at 33-37 & n 62.  These accusations are transparent attempts to suggest that a legitimate application of equity is a mere effort to install my own policy views.  Not only could that not be further from the truth, but such belittling is a grave disservice to the citizens of this state.

As I have discussed, and as is thoughtfully articulated by Justice Weaver, the *Lewis* decision was neither "'unworkable'" nor "'badly reasoned.'"  See *ante* at 29.  Rather, it was based on a centuries-old recognition of equitable tolling as an appropriate measure for avoiding injustices.  It had "'practical workability'" by requiring that both parties act promptly and by not giving either party an undue advantage over the other.[14]  The decision was crafted in an effort to make undesired preemptive litigation unnecessary.  There are no changes in the law or facts that justify overturning the decision.  There are, contrary to the majority's assertion otherwise, reliance

---

[14] To the extent the Court of Appeals may have misapplied the requirement that an insured must submit a specific claim for benefits in *Johnson*, *supra*, such error is easily corrected.  If the Court of Appeals erred, we need not, as the majority insists, clamor to overrule the underlying case. See *ante* at 30.  Rather, the usual, and much more logical, path is to overturn the aberrant Court of Appeals case if it did not adhere to our prior precedent.

interests at play that will, when *Lewis* is overruled, work undue hardships on insureds and on medical providers.

Insureds routinely choose their course of action—waiting or suing—on the basis of the actions of their insurers. Relying on equitable tolling, an insured knows that he need not rush to court the second the one-year period set forth in § 3145(1) has elapsed. The undue hardship that will result from overturning *Lewis* is that instead of being able to engage in negotiations with an insurer, an insured must jump the gun, expend unnecessary time and resources, sue her insurer, and put herself in the awkward position of withstanding a summary disposition motion. Medical providers as well will suffer undue hardship because they will, in many instances, bear the losses that will result when an insurer does not timely deny a claim and when the insured does not run to court to file a now-necessary preemptive lawsuit. It is quite logical to assume that medical providers have been relying on the equitable tolling rule of *Lewis* by continuing to provide treatment during the period in which a claim has not yet been denied.

The majority bizarrely claims that "the impact of *Lewis* is increasingly producing a tax on the no-fault system as claimants are being permitted to seek recovery

for losses incurred much more than one year prior to commencing suit." *Ante* at 29. But this fails to recognize that the benefits were already legitimately owed—thus, they can hardly be characterized as a "tax." And in a situation where an insurer deliberately engages in dilatory tactics to avoid paying benefits, the nomenclature is even more unfitting.

The *Lewis* decision was sound, had practical workability, and gave clear guidance that is being relied upon on a daily basis. Further, the decision was grounded in an equitable rule, not "judicial *defiance*" as the majority so histrionically proclaims, so the Court did not incorrectly interpret the statute. See *ante* at 28. There is simply no basis for expunging *Lewis* and ignoring the directives of the doctrine of stare decisis. The best that can be said of today's majority opinion is that it does indeed create a crystal-clear directive to Michigan's insureds: if your claim has not been paid or formally denied within one year of your request, sue.

### V. The Majority's Decision Should Not be Applied Retroactively

For the reasons aptly set forth by Justice Weaver, I fully agree that the majority's misguided decision should

not be visited on any insured by way of retroactive application.

### VI.   The Majority's Tone Disserves the Judiciary

Some readers, like myself, might find it difficult to wade through the thick swamp of hyperbole and rhetoric that permeates the majority's opinion.  With its opprobrious language,[15] the majority haughtily assumes that no view

---

[15] Discrediting a long line of the past opinions written by a bench curiously not including any member of the current majority, the majority gets quite carried away in an apparent effort to convince the reader that its view is superior to any other ever proffered.  Keeping in mind the above discussion of the widespread acceptance of equitable tolling and the reasons why applying tolling to § 3145(1) is necessary to fulfill the purposes of the no-fault act and to prevent an insurer from wrongfully withholding benefits from an injured plaintiff, consider these frenzied phraseologies:  "under this thin veil, [the majorities] inserted their own policy views," *ante* at 13; "impermissible departure," *ante* at 19; "supplanted the will of the Legislature with its own assessment of policy and consumer expectations," *ante* at 20; "curious incongruity," *ante* at 21; "quite broad," *ante* at 22; "vague," *ante* at 23; "dismantled the certainty," *id.*; "questionable lineage," *id.*; "judicial negation," *id.*; "abrupt departure from settled precedent," *id.*; "shrugged off the weight of binding precedent," *ante* at 24; "crafting its own amendment," *id.*; "distortion," *id.*; "unmanageability," *id.*; "purely for policy reasons," *id.*; "direct contravention of the statutory language," *id.*; ""prevailing policy whims," *ante* at 25; "own perception," *id.*; "impermissibly legislated from the bench," *id.*; "speculation," *id.*; "acted outside its constitutional authority," *ante* at 25-26; "importing its own policy views," *ante* at 26; "we are unable to perceive any sound policy basis," *id.*; "judicial *defiance*," *ante* at 28 (emphasis in original); "judicial

---

other than its own is worthy of the printed page.  Given that equitable tolling has a long history in state and federal jurisprudence, and given the persuasive reasons why an equitable remedy is mandated to prevent manifest injustice to insureds seeking benefits under § 3145, I fail to grasp the basis for the criticisms.

Moreover, the majority's overwrought scorn is rife with sarcasm,[16] sloganeering,[17] and outright fabrication.[18] The majority's unbending devotion to strict textualism should not come at the expense of recognizing that the judiciary is not a mere robotic cog in the wheel of our three-branch system of government.[19]  Rather, the judiciary

---

usurpation," *id.*; and "defies 'practical workability,'" *ante* at 29; and "wrongly decided," *ante* at 30.

[16] See n 15 of this opinion.

[17] See *id*.

[18] See *id*.

[19] Indeed, as in this case, strict textualism can have consequences that we would be wise to avoid.  See Zelinsky, *Travelers, reasoned textualism, & the new jurisprudence of ERISA preemption*, 21 Cardozo L R 807, 808 n 3 (1999):

> See, e.g., Ellen P. Aprill, The Law of the Word: Dictionary Shopping in the Supreme Court, 30 Ariz. St. L. J. 275, 324 (1998) (criticizing *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85 (1983), as an "easy, dictionary-driven, plain meaning disposition of the term . . . [which] produced a flood of litigation for the lower federal courts"; Catherine L. Fisk, The Last

has the ability—indeed, the responsibility—to do equity where equity is required. Were that authority not historically within the judiciary's purview, such a creature as equity would not even exist.

Further, the current majority has an obvious inability to recognize that *to whatever extent* a view different from the view it holds could be considered "judicial activism," see, e.g., n 15 of this opinion, its own view can as well. In other words, accusing the *Lewis* Court of judicial activism simply because the Court reached a conclusion that this majority takes issue with does nothing to further the legitimate debate that surrounds divergent approaches. The majority opinion reeks of an unfortunately familiar tone that is, quite frankly, getting old.[20]

---

Article About the Language of ERISA Preemption? A Case Study of the Failure of Textualism, 33 Harv. J. on Legis. 35, 39 (1996) ("If ever there were a case study of the failures of textualism as a method of statutory interpretation, this is it."); Peter D. Jacobson & Scott D. Pomfret, Form, Function, and Managed Care Torts: Achieving Fairness and Equity in ERISA Jurisprudence, 35 Hous. L. Rev. 985, 990 (1998) (criticizing the Supreme Court for "a mechanical approach [to ERISA preemption] that adheres to a strict 'plain language' interpretation without questioning whether the result of these interpretations can be reconciled with congressional intent").

[20] The authors of such phrases as those quoted in n 15 of this opinion would do well to keep in mind that despite how ardently they convince themselves of the supremacy of

35

## VII. Conclusion

Equitable tolling has a venerable history in federal and state jurisprudence that today's majority ill-advisedly chooses to disregard in favor of denigrating the purposes of the no-fault act. I, unlike the majority, am not content with the dismissive notion that "the Legislature has made it so." See *ante* at 25. The citizens of Michigan, and the Legislature, deserve better.

As is consistently recognized by the majority, our role is to effectuate the intent of the Legislature. Because I believe that equitable tolling has an important role in *effecting the Legislature's intent*, that *Lewis* was correctly decided, and that overturning *Lewis* will work an unjustifiable hardship on injured insureds and the no-fault system as a whole, I respectfully dissent.

Michael F. Cavanagh
Marilyn Kelly

---

their position, their reasoning is not infallible. See *Halbert v Michigan*, ___ US ___; 125 S Ct 2582; 162 L Ed 2d 552 (2005); *Yellow Transportation, Inc v Michigan*, 537 US 36; 123 S Ct 371; 154 L Ed 2d 377 (2002).

S T A T E   O F   M I C H I G A N

SUPREME COURT

EVA DEVILLERS, as Guardian and
Conservator of Michael J. Devillers,

    Plaintiff-Appellee,

v                                                    No. 126899

AUTO CLUB INSURANCE ASSOCIATION,

    Defendant-Appellant.

_____

WEAVER, J. *(dissenting).*

I respectfully dissent from the majority opinion overruling *Lewis v DAIIE,* 426 Mich 93; 393 NW2d 167 (1986), and I disagree with the majority's decision to give its opinion limited retroactive, instead of prospective, effect.

I

Had I been on the Michigan Supreme Court in 1986, I would likely have joined Justice Brickley and Justice Riley in dissenting from *Lewis.* I agree with Justice Brickley's dissent in *Lewis,* and his statement that

> [s]ection 3145 is clear in its directive that a claimant cannot recover benefits for losses incurred more than one year prior to the commencement of the suit; not one year plus the period of time between making the claim and the denial of the claim as the majority holds. [*Lewis, supra,* at 105.]

But nineteen years later, I cannot join the majority's decision to overrule the longstanding precedent applying judicial tolling to this statute.  In this case, there is no need to unsettle the law and disregard the doctrine of stare decisis.

Under the doctrine of stare decisis, it is necessary to follow earlier judicial decisions when the same points arise again in litigation.  Garner, *A Dictionary of Modern Legal Usage* (New York: Oxford University Press, 1995), p 827.  This promotes stability in the law.  In determining whether to overrule a prior case, pursuant to the doctrine of stare decisis, this Court should first consider whether the earlier decision was wrongly decided.  If it was wrongly decided, the Court should then examine reliance interests: whether the prior decision defies "practical workability"; whether the prior decision has become so embedded, so fundamental to everyone's expectations that to change it would produce not just readjustments, but practical real-world dislocations; whether changes in the law or facts no longer justify the prior decision; and whether the prior decision misread or misconstrued a statute.  *Robinson v Detroit,* 462 Mich 439, 464-467; 613 NW2d 307 (2000).

As stated above, I agree with Justice Brickley's dissent in *Lewis;* I would find that *Lewis* was wrongly decided. But after examining the reliance interest factors, I would not overrule *Lewis.* First, the *Lewis* decision does not defy "practical workability"; it has been applied for nineteen years without causing any fundamental problems with no-fault insurance. Second, the *Lewis* decision has indeed become "so embedded, so fundamental, to everyone's expectations that to change it would produce not just readjustments, but practical real-world dislocations." *Robinson, supra* at 466. Claimants who consulted an attorney on whether they needed to file suit after receiving no response to a filed claim would have been told, on the basis of *Lewis,* that filing the claim had preserved their rights until they received an answer from the insurance company. Changing that rule now will affect an unknown number of claimants who will lose their rights to benefits that had previously been protected. Third, there have been no changes in the law or facts since *Lewis* was issued. Finally, *Lewis* did not misread or misconstrue a statute; instead, it applied judicial tolling to the statute as an equitable matter.

In light of the doctrine of stare decisis and the purposes it serves, neither the defendant nor the majority

3

have given sufficient reason to overrule *Lewis*. Correction for correction's sake does not make sense. The case has not been made why the Court should not adhere to the doctrine of stare decisis in this case.

If there are genuine problems with *Lewis*'s application of the judicial tolling doctrine, they can be brought to the Legislature's attention by the insurance industry.

## II

Further, I disagree with the majority's decision to give its decision limited retroactive effect. Because its decision overrules nineteen years of precedent and because claimants may have acted in reliance on *Lewis*, the majority's decision should be applied prospectively.

## A

A judicial decision can be applied with full retroactivity, with limited retroactivity, or prospectively. *Monat v State Farm Ins Co*, 469 Mich 679, 702; 677 NW2d 843 (2004) (Cavanagh, J., dissenting).

When a decision is given full retroactive effect, the parties in that case are bound by the decision, and the parties in other cases then pending, as well as any potential claimants who would have filed suits in the future, are bound by it as well. See *Tebo v Havlik,* 418

4

Mich 350, 363-364; 343 NW2d 181 (1984) (opinion by Brickley, J.).

The majority has decided to give its ruling *limited* retroactive effect. This means that its ruling will apply "only in cases commenced after the overruling decision and in pending cases where the issue had been raised and preserved." *Stein v Southeastern Michigan Family Planning Project, Inc,* 432 Mich 198, 201; 438 NW2d 76 (1989). Accordingly, for any cases filed before today's decision, that is, any cases that have been brought in reliance on our ruling in *Lewis*, the parties will not be bound by today's decision unless the issue has been raised and preserved. However, the parties to an unknown number of pending claims will be bound by the majority's decision where the claimant relied on *Lewis*'s ruling.

The most flexible approach, which would be the least harmful application of the majority's decision, would be to apply the ruling prospectively. Prospective application would apply this ruling only to cases filed after today's decision, and would not bind the parties in this case to today's decision. *Tebo, supra* at 364. See Comment, *Michigan's civil retroactivity jurisprudence: A proposed framework*, 2002 L Rev MSU-DCL 933 (2002).

5

As the majority has noted, the general rule is that judicial decisions are to be given full retroactive effect. *Hyde v Univ of Michigan Bd of Regents*, 426 Mich 223, 240; 393 NW2d 847 (1986). But this Court has used a more flexible application of its rulings in situations where applying the ruling with complete retroactivity would result in an injustice to a certain class of litigants. *Gladych v New Family Homes, Inc*, 468 Mich 594, 606; 664 NW2d 705 (2003). In fact, this Court noted in *Hyde* that "[w]e often have limited the application of decisions which have overruled prior law or reconstrued statutes." *Hyde, supra* at 240.

Today, the majority has both overruled prior law and reconstrued a statute. By overruling *Lewis*, the majority has overruled the law regarding the tolling of the one-year-back limitations period that has been in place in the state of Michigan for the past nineteen years. Further, the majority's decision today rests largely on the reinterpretation of MCL 500.3145(1). Under these circumstances, the majority certainly has the discretion to apply this ruling prospectively, and should do so out of fairness to those who have acted in reliance on the nearly two decades of precedent that preceded this ruling.

Because today's decision overrules settled precedent, it should be applied prospectively. This Court issued its decision in *Lewis* more than nineteen years ago. Therefore, the law in the state of Michigan over that period has been that the one-year-back time limitation of MCL 500.3145(1) for claimants to recover no-fault personal protection insurance benefits was tolled from the time that the claim was filed until the time when the insurer formally denied liability. Furthermore, from the time of our decision in *Lewis* until the present case, this Court has neither issued a ruling nor "foreshadowed" that the interpretation of this tolling of the one-year-back limitations period would be changed. Under these circumstances, prospective application of today's decision is appropriate.

Under the majority's rule, any claimant who postponed his or her decision to file a suit against an insurance company in reliance on *Lewis* is now barred from recovering benefits from more than one year before the time that suit is filed if the defendant insurance company raised and preserved the issue at trial. Hence, any insurance company that raised this issue at trial in the hopes that this Court would overrule *Lewis* will now be rewarded at the expense of the claimants who acted in complete accord with the law. This situation creates precisely the type of

7

injustice that this Court intended to prevent by creating flexibility in the application of its decisions. Unfortunately the majority's decision today disregards this precedent and will cause injustice.

III

For these reasons, I respectfully dissent from the majority's decision.

Elizabeth A. Weaver